FEE PAID                    FILED

2022 MAR 23  PM 2:42

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY: ___EEE___

1  DING CHEN
2  1118 E EMERSON AVE
3  MONTEREY PARK, CA 91755
4  CELL PHONE: (650) 784-9381
5  EMAIL: DINGCHEN2007@YAHOO.COM
6  In Pro Se
7
8

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DING CHEN,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>CHRISTINE WORMUTH,<br>SECRETARY OF THE ARMY<br><br>　　　　Defendant. | Case No.:<br>2:22-CV-01905-ODW-MRW x<br><br>**COMPLAINT FOR HEARING ON DISCHARGE UPGRADE AND RELATED CORRECTIONS** |

## COMPLAINT

1. This complaint involves judicial review by the Court of a final decision of the Army Board for the Correction of Military Records (ABCMR) denying Plaintiff's application to upgrade his discharge and make related corrections. Plaintiff, Mr. Ding Chen, was involuntarily separated from the Army with general under honorable conditions character of service.

### I. THE PARTIES

2. Plaintiff Ding Chen is an Army Veteran. Plaintiff was adversely affected by a decision of the Army Board for the Correction of Military Records (ABCMR), which acts on behalf of Defendant. Plaintiff resides within the jurisdiction of this Court.

3. Defendant is the Honorable Christine Wormuth, Secretary of the Army. Defendant denied Plaintiff's applications which are the subject of this action.

## II. JURISDICTION AND VENUE

4. This Honorable Court has jurisdiction over the present action pursuant to Administrative Procedure Act, 5 USC § 551 et seq.; see § 701 et seq.; 28 USC § 1331, 1346; 8 USC § 1329.

5. Venue is proper in this Honorable Court pursuant to 28 USC § 1391(e). Plaintiff Ding Chen resides within the District.

## III. EXHAUSTION OF ADMINISTRATIVE REMEDIES
## AND STATUTE OF LIMITATIONS

6. Plaintiff was involuntarily separated from the Army on June 29, 2012.

7. On October 20, 2020, the ABCMR entered a final decision denying Plaintiff's application to correct his military records. (*See* **Exhibit A**)

8. Plaintiff has exhausted all administrative remedies available to him.

9. 28 U.S.C § 2501 requires the filing of a claim in this Court within six (6) years after such claim first accrues.

10. Plaintiff's claim accrued on October 20, 2020, when the ABCMR issued a final decision on his application.

11. Plaintiff's complaint is timely filed.

## IIII. STATEMENT OF FACTS

12. Plaintiff enlisted in the United States Army on 09/16/2009 through the Military Accessions Vital to National Interest (MAVNI) program. At the time of his enlistment, Plaintiff provided all the required documents and information including his immigration status. Plaintiff's immigration status was based on his marriage to his wife who was an American citizen. Plaintiff was processed at a Military Entrance Processing Station (MEPS) and cleared for enlistment in the Army on 07/28/2009.

13. After Plaintiff joined the Army, he applied U.S. citizenship based on his

COMPLAINT FOR HEARING ON DISCHARGE UPGRADE AND RELATED CORRECTIONS

military service and filed his N-400 Application for Naturalization with the United States Citizenship and Immigration Services (USCIS) on 02/01/2010. This is the only one application filed by Plaintiff for U.S. Citizenship.

14. Plaintiff was serving honorably as a member of the United States Army for over two years when an investigation was initiated. The USCIS reported that Plaintiff may have fraudulently enlisted in the Army, because it was possible that Plaintiff was involved in a fraudulent marriage before he joined the Army and violated immigration law and enlisted with the legal status obtained by the possible fraudulent marriage.

15. Through the course of the investigation by the Army Criminal Investigation Division (CID), Plaintiff denied fraudulent marriage and fraudulent enlistment. Plaintiff was never charged after the investigation. However, Plaintiff's commander (the separation authority) decided to discharge Plaintiff on 06/29/2012 under Army Regulation (AR) 635-200, with the narrative reason "Fraudulent Entry", and with general discharge under honorable conditions.

16. After Plaintiff left the Army, the USCIS scheduled an interview (examination) for Plaintiff's pending U.S. Citizenship application on 10/16/2012. Ultimately Plaintiff was cleared of the allegation of violating immigration law and Plaintiff's U.S. Citizenship application was granted. Plaintiff took the Oath of Allegiance at a judicial naturalization ceremony which was administered by this Honorable Court and became a U.S. citizen on 05/23/2013.

17. Plaintiff tried to upgrade his military discharge and make corrections to his military records. He applied to Army Discharge Review Board (ADRB) and Army Board for Correction of Military Records (ABCMR) and was denied.

## V. CAUSES OF ACTION

18. There were legal errors and misconducts occurred during the discharge process and review process, and these errors and misconducts affected the outcome of this discharge case.

COMPLAINT FOR HEARING ON DISCHARGE UPGRADE AND RELATED CORRECTIONS

## V.1 FIRST CAUSE OF ACTION:
## DISCHARGE WITHOUT BASIS

19. The basis for this discharge case was the possible fraudulent marriage. However, Plaintiff never admitted it, and was never charged for it, and will not be charged because the 5-year statute of limitations has lapsed. Defendant lacked jurisdiction to determine if or not the marriage was fraudulent, and therefore essentially Defendant had no jurisdiction to determine if or not Plaintiff committed Fraudulent Entry.

**V.1.(a) The Discharge Was Based on the Possible Fraudulent Marriage**

20. The separation authority made these 3 findings to discharge Plaintiff (**See Exhibit D**):

    a. That SPC Ding Chen (Plaintiff) concealed information that his conditional permanent residence in the United States at the time of enlistment was not valid because his temporary marriage visa was procured by a fraudulent marriage. In order to effect the fraudulent marriage, SPC Chen violated 18 USC § 371 (conspiracy to commit offence or to defraud the United States), 8 USC § 1325(c) (immigration marriage fraud); and 18 USC 1546(a) (using false statement to obtain green card).

    b. That SPC Chen (Plaintiff) did not meet citizen requirements when he enlisted, and that this requirement is of a disqualifying nature for enlistment. In making this determination, I considered AR 601-2810, para. 2-4 and 4-22, and 10 § USC 504, and Memorandum, Deputy Chief of Staff, 28 Jan 09, subject: Military Accessions Vital to the National Interest (MAVNI) Pilot Program Implementation Policy.

    c. That SPC Chen (Plaintiff) enlisted through the MAVNI program on 28 Jul 09. The Army believed he was authorized to participate in the program because he falsely represented that he was legally in the United States by possessing a temporary visa procured by a bona fide marriage to a United

COMPLAINT FOR HEARING ON DISCHARGE UPGRADE AND RELATED CORRECTIONS

1    States citizen. The MAVNI program is open only to individuals who have

2    had a valid immigration status for the previous two years prior to their

3    enlistment. SPC Chen's immigration status was not valid.

4    21. It is clear that the Finding (a) and Finding (c) are essentially same. Both of

5    them were solely based on the possible fraudulent marriage.

6    22. In the Finding (b), the separation authority did not mention how and why

7    Plaintiff "did not meet citizen requirements when he enlisted". In the ABCMR's

8    reply, the Board focused on the possible fraudulent marriage to support this

9    Finding (b). (*See* **Exhibit A, Page 32, 33**)

10   23. Therefore, the key issue in this instant case is if Plaintiff's marriage was

11   fraudulent. If the marriage was determined to be fraudulent, the 3 findings would

12   be valid. However, if the marriage was not determined to be fraudulent, the 3

13   findings would be baseless.

14   **V.1.(b) The Possible Fraudulent Marriage Occurred and Was Complete**

15   **Before Plaintiff Joined the Army**

16   24. 8 U.S.C. § 1325(c) / Section 275(c) of the Immigration and Nationality Act

17   provides "Any individual who knowingly enters into a marriage for the purpose of

18   evading any provision of the immigration laws shall be imprisoned for not more

19   than 5 years, or fined not more than $250,000, or both."

20   25. Based on case law (*U.S. v. Yunier Moreno Rojas,* No. 12-15364, 718 F.3d

21   1317, 11th Circuit, June 20, 2013), the fraudulent marriage is not a continuing

22   crime. The court stated "After a thorough review, we conclude that the plain

23   meaning of § 1325(c) dictates that the crime of marriage fraud is complete on the

24   date of marriage… nothing in the text of § 1325(c) compels the conclusion that

25   Congress intended marriage fraud to be a continuing offense… Congress's use of

26   the phrase "enters into" in the explicit language of the statute — an act that can

27   only occur on the singular date that a marriage takes place — upends the district

28   court's conclusion that marriage fraud is a continuing offense…"

COMPLAINT FOR HEARING ON DISCHARGE UPGRADE AND RELATED CORRECTIONS

**V.1.(c) Defendant Has No Jurisdiction To Determine This Marriage Case**

26.  In this discharge case, the possible crime of marriage fraud occurred and was completed in 2007, before Plaintiff joined the Army in 2009. Plaintiff was a civilian and had no connection to the armed forces in 2007. Plaintiff was not in military status at the time of the possible offense and therefore was not subject to the military jurisdiction. *United States v. Cline,* 29 M.J. 83 (1989). The possible fraudulent marriage occurred off-post. The civilian court had jurisdiction over this case, and it was not necessary for the Army to judge Plaintiff's marriage. Also, no UCMJ (Uniform Code of Military Justice) article is called "fraudulent marriage" or "fraudulent immigration".

27.  In *United States ex rel. Toth v. Quarles,* 350 U.S. 11 (1955), the Supreme Court held: "This assertion of military authority over civilians cannot rest on the President's power as Commander-in-Chief, nor on any theory of martial law. P. 14… The power granted Congress "To make Rules" to regulate "the land and naval Forces" is to be construed as restricting court-martial jurisdiction to persons who have a relationship with the armed forces. P. 15… The constitutional grant of power to Congress to regulate the armed forces does not empower Congress to deprive civilians of trials under Bill of Rights safeguards; and power to circumvent those safeguards is not to be inferred from the Necessary and Proper Clause. Pp. 21-22… Considerations of discipline in the armed forces do not warrant expansion of court-martial jurisdiction at the expense of the normal and constitutionally preferable system of trial by jury. Pp. 22-23."

**V.1.(d) The Fraudulent Entry Determined by Defendant Was Invalid**

28.  The Fraudulent Entry determined by Defendant was solely based on the possible fraudulent marriage which was outside of Defendant's jurisdiction. Therefore essentially Defendant had no jurisdiction over the "Fraudulent Entry". The "questions of jurisdiction" in the military law context "are not subject to waiver". (*United States v. Alexander,* 61 M.J. 266, 269 (C.A.A.F.2005)) The

6

judgment made by Defendant without jurisdiction was invalid.

29. 5 U.S. Code § 706(2)(C) Administrative Procedure Act provides: "The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" .

30. 5 U.S. Code § 558(b) Administrative Procedure Act provides: "A sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law".

**V.1.(e) Defendant's Discussion and Plaintiff's Argument**

31. The ABCMR acknowledged Plaintiff's contention regarding legal basis and jurisdiction. (*See* **Exhibit A, Page 3, 4 and 5**) In the Board Discussion Section the ABCMR replied (*See* **Exhibit A, Page 30**):

a. The Army lacked jurisdiction to determine whether his marriage was fraudulent.

(1) The term "jurisdiction" applies to the exercise of legal/judicial authority; separations under AR 635-200 are administrative in nature, and its authority is based on applicability rather than jurisdiction. AR 635-200 is a regulation that is applicable to all active duty enlisted Soldiers, and, at the time of his separation, section III (Separation Authority) the regulation's chapter 1 (Purpose) gave the applicant's Group commander the authority to approve the applicant's separation action.

(2) An administrative inquiry, such as one conducted under chapter 7, AR 635-200, was not bound by judicial standards; such an inquiry was not intended to determine guilt or innocence, and neither judicial rules of evidence nor beyond-a-reasonable-doubt standards of proof applied. The regulation limited the separation authority's inquiry to an administrative determination of whether there was potentially disqualifying information and if the applicant misrepresented, omitted, or concealed it. In conducting

this inquiry, the separation authority was empowered to use all available

evidence (to include hearsay), and to employ a preponderance of evidence

standard of proof (i.e. where the weight of the evidence presented is greater

than 50-50).

(3) The applicant's assertion as the Army's lack of authority hinges on the

fact his allegedly fraudulent marriage occurred before he entered the Army;

however, all fraudulent entry determinations necessarily involve

potentially disqualifying events that took place before an enlistment.

32.  In Discussion a(1), the ABCMR essentially affirmed the Army had no

jurisdiction over the possible fraudulent marriage case, but the separation under

Army Regulation (AR) 635-200 was still applicable, because Plaintiff was an

active duty enlisted soldier and his commander had the authority to approve the

discharge. An underlying misconception in the ABCMR's reply is that if

somebody is authorized to approve a discharge case and he approved, the discharge

is legal and proper. However, there are many illegal discharge cases that were

approved by authorized persons and the ABCMR should know that. The authority

to approve a discharge does not guarantee the discharge itself is legal and proper.

For example, Plaintiff mentioned two cases in his application to the ABCMR,

*Wilhelmus v. Geren,* 796 F. Supp. 2d 157 (D.D.C. 2011), (***See* Exhibit A, Page 14,

15, Section (4)**), and *Gonzalez v. United States,* 44 Fed. Cl. 764 (1999) (***See*

Exhibit E; Exhibit A, Page 8, Section (6)(b)**). In these cases the two Plaintiffs

were discharged by the Army and their discharges were approved by authorized

commanders, and the ABCMR confirmed that they were discharged legally and

properly. However, the courts determined that the two discharge actions were

illegal.

33.  The word "jurisdiction" means "the power, right, or authority to interpret and

apply the law" (Defined by the Merriam-Webster OnLine Dictionary). In this

instant case, if Defendant want to "interpret and apply the law" and determine that

Plaintiff committed the crime of marriage fraud and therefore committed fraudulent entry, Defendant should have the jurisdiction. However, AR 635-200 did not give Plaintiff's commander the authority to determine a civilian case, such as the possible fraudulent marriage case which is the basis for the separation.

34. In Discussion a(2), the ABCMR mentioned an "inquiry" in chapter 7, AR 635-200. This "inquiry" will be discussed in the following two Causes of Action. Here it seems the ABCMR wanted to say the separation authority can "use all available evidence (to include hearsay)" to make "an administrative determination of whether there was potentially disqualifying information", without intention "to determine guilt or innocence". (emphasis added)

35. However, Plaintiff was not discharged because of "potentially disqualifying information". If or not there was "potentially disqualifying information" is irrelevant to this instant case. Also, if the "potentially disqualifying information" is outside of the Army's jurisdiction and the Army has no "power, right, or authority to interpret and apply the law", the Army should not make "an administrative determination of whether there was potentially disqualifying information".

36. In Discussion a(3), the ABCMR still did not answer the key question: Who determined the fraudulent marriage? Since nobody determined it, this possible crime was undetermined.

37. It seems the ABCMR wanted to say: because a civilian case is involved in the determination of a UCMJ violation, the Military automatically has the authority to determine that civilian case. However, this construction is not appropriate. If this logical basis is true, all civilian cases related to military cases would be under the court-martial jurisdiction and technically the Military has jurisdiction to determine any civilian case. Apparently that is against the Constitution.

## V.2 SECOND CAUSE OF ACTION:

## DEFENDANT DID NOT FOLLOW AR 635-200

**V.2.(a) AR 635-200, Paragraph 7-17 Provides That Commanders Must Verify**

9

**the Existence and True Nature of the Apparently Disqualifying Information**

38.  AR 635-200, Chapter 7, paragraph 7-17 (Incident of fraudulent entry) provides: "The following tests must be applied in each case of <u>suspected</u> fraudulent enlistment or re-enlistment. These tests will establish whether the enlistment or re-enlistment is fraudulent… (2) *Second test*. Commanders <u>must verify</u> the existence and true nature of the apparently disqualifying information. Verification of the actual offense may reveal that the enlistee was not disqualified and, therefore, is not a fraudulent enlistee. For example, if the Soldier alleged that he/she was convicted of burglary and placed on probation, inquiries must be made as to whether the Soldier was actually convicted of burglary. In fact, the Soldier may have initially been charged with burglary, but the charge may have been reduced to trespass, which is a minor non-traffic offense for enlistment purposes that is not disqualifying for enlistment or re-enlistment. To conduct an inquiry using these tests to establish existence of fraud, a delay of 30 days is considered reasonable." (emphasis added)

39.  This is the regulation used to discharge Plaintiff and the statutory tests set the standards on how the Army should determine fraudulent entry. The Army should follow its own rulebook.

40.  The example in "Second test" was provided by AR 635-200 specifically to illustrate how "verification of the actual offense may reveal that the enlistee was not disqualified and, therefore, is not a fraudulent enlistee." In this example, "the Soldier" was alleged for burglary before enlistment, but was convicted for trespass. Therefore "verification of the actual offense" revealed "that the enlistee was not disqualified and, therefore, is not a fraudulent enlistee."

41.  In the instant case, if inquiries were made by the commander and/or the review boards "as to whether the Soldier (Plaintiff) was actually convicted of" fraudulent marriage, the result of inquiries would be that Plaintiff was never charged with fraudulent marriage at all and will not be charged, due to the five-

COMPLAINT FOR HEARING ON DISCHARGE UPGRADE AND RELATED CORRECTIONS

1  year statute of limitations. (*U.S. v. Yunier Moreno Rojas,* No. 12-15364, 718 F.3d

2  1317, 11th Circuit, June 20, 2013)

3  42. Since "the Soldier" "was not disqualified and, therefore, is not a fraudulent

4  enlistee", Plaintiff was not a fraudulent enlistee either and Plaintiff should not have

5  been discharged for fraudulent entry.

6  **V.2.(b) Defendant's Discussion and Plaintiff's Argument**

7  43. The ABCMR acknowledged Plaintiff's contention regarding AR 635-200.

8  (*See* **Exhibit A, Page 6, 7**) In the Board Discussion Section the ABCMR replied

9  (*See* **Exhibit A, Page 30**):

10      a.(2) An administrative inquiry, such as one conducted under chapter 7, AR

11      635-200, was not bound by judicial standards; such an inquiry was not

12      intended to determine guilt or innocence, and neither judicial rules of

13      evidence nor beyond-a-reasonable-doubt standards of proof applied. The

14      regulation limited the separation authority's inquiry to an administrative

15      determination of whether there was potentially disqualifying information

16      and if the applicant misrepresented, omitted, or concealed it. In conducting

17      this inquiry, the separation authority was empowered to use all available

18      evidence (to include hearsay), and to employ a preponderance of evidence

19      standard of proof (i.e. where the weight of the evidence presented is greater

20      than 50-50).

21  44. However, the Second test in the Army Regulation is bound by judicial

22  standards. Even if an inquiry is not necessary, the regulation provides:

23  "Commanders <u>must verify</u> the existence and true nature of the apparently

24  disqualifying information".  (emphasis added)

25  45. The word "verify" means "to establish the truth, accuracy, or reality of".

26  (Defined by the Merriam-Webster OnLine Dictionary) Apparently "an

27  administrative determination of whether there was potentially disqualifying

28  information" is not enough to pass the Second test which is required by Army

1  Regulation and bound by judicial standards.

2    46.  Plaintiff raised the issue about the "Second test", and the ABCMR

3  acknowledged it. (*See* **Exhibit A, Page 7, Section (f)** "The ADRB failed to

4  explain how the separation authority fulfilled the regulation's second test, as

5  outlined in paragraph 7-17"). But the ABCMR did not answer how the "Second

6  test" was fulfilled either. It's not harmless error. It is not enough for the board

7  merely to acknowledge that an argument exists, *Rudo,* 818 F. Supp. 2d at 26-27. It

8  is well-established that a decision by the ABCMR that fails to address a plaintiff's

9  non-frivolous and material arguments is arbitrary. (*Frizelle v. Slater,* 111 F.3d 172,

10  177 (D.C. Cir. 1997)).

11    47.  If (Since) the Second test was not passed, this discharge was illegal. 5 U.S.

12  Code § 706(2)(D) Administrative Procedure Act provides:  "The reviewing court

13  shall ... hold unlawful and set aside agency action, findings, and conclusions found

14  to be ... without observance of procedure required by law". "An agency action is

15  arbitrary and capricious if the agency failed to follow procedure as required by

16  law" (*Calloway v. Brownlee,* 366 F.Supp.2d 43, 53 (D.D.C.2005)).

### V.3 THIRD CAUSE OF ACTION:

### DEFENDANT DID NOT FOLLOW

### THE "ARBITRARY OR CAPRICIOUS" STANDARD OF THE APA

**V.3.(a) Plaintiff's Discharge Case Was Parallel to the Example in AR 635-200**
**and Should Be Decided in the Same Way**

22    48.  Army Regulation 635-200 sets forth the basic authority for the separation of

23  enlisted personnel. Chapter 7, paragraph 7-17 (Incident of fraudulent entry)

24  provided an example in "Second test" to illustrate how to "verify the existence and

25  true nature of the apparently disqualifying information".

26    49.  The word "example" means "a parallel or closely similar case especially

27  when serving as a precedent or model; an instance (such as a problem to be solved)

28  serving to illustrate a rule or precept or to act as an exercise in the application of a

12

COMPLAINT FOR HEARING ON DISCHARGE UPGRADE AND RELATED CORRECTIONS

1   rule" (Defined by the Merriam-Webster OnLine Dictionary). Therefore this
2   example in "Second test" should be treated as "a precedent or model". If a real
3   case is "parallel or closely similar" to this example, the enlistment of the soldier
4   was not fraudulent, and the soldier should not be discharged for fraudulent entry.

5      50.  It's beyond a reasonable doubt that "the Soldier" committed trespass since
6   he/she was convicted. It's probable that "the Soldier" also committed burglary
7   since he/she was initially charged with burglary. The prosecutor should have some
8   reason to do so. But "the Soldier" was not convicted of burglary (possibly for
9   insufficient evidence to prove beyond a reasonable doubt). Therefore based on AR
10  635-200, the enlistment of "the Soldier" was not fraudulent and he should not be
11  discharged for fraudulent entry.

12     51.  This example provided by AR 635-200 is "parallel or closely similar" to
13  Plaintiff's case. Both "the Soldier" and Plaintiff were alleged for isolated events
14  that occurred before they enlisted, and the Army had no jurisdiction over those
15  isolated events, and therefore "inquiries must be made as to whether the Soldier
16  was actually convicted".

17     52.  The difference is that "the Soldier" was charged and convicted, and Plaintiff
18  was not. Because "the Soldier" was finally convicted for a less severe offense,
19  "verification of the actual offense" revealed "that the enlistee was not disqualified
20  and, therefore, is not a fraudulent enlistee." Plaintiff's situation is better than "the
21  Soldier" because he was not charged and he had no conviction. To be fair, Plaintiff
22  deserved the same (if not better) treatment. Since "the Soldier" should not be
23  discharged, Plaintiff should not have been discharged.

24     53.  Defendant did not follow the "arbitrary or capricious" standard of the APA.
25  The Court stated: "[I]f an agency treats similarly situated parties differently, its
26  action is arbitrary and capricious in violation of the APA." (*El Rio Santa Cruz*
27  *Neighborhood Health Ctr., Inc. v. Dept. of Health and Human Serv.,* 300
28  F.Supp.2d 32, 42 (D.D.C.2004)); "Government is at its most arbitrary when it

1   treats similarly situated people differently." (*Etelson v. Office of Personnel*

2   *Management,* 684 F.2d 918, 926 (D.C.Cir.1982)); "An agency decision is owed no

3   deference if it fails to give a reason that a court can measure. . . against the

4   'arbitrary or capricious' standard of the APA." (*Coburn v. McHugh,* 679 F.3d 924

5   (2012)). Defendant's denial decision must be set aside because it is "arbitrary,

6   capricious, an abuse of discretion, or otherwise not in accordance with law." 5

7   U.S.C. § 706(2)(A).

8   **V.3.(b) Defendant's Discussion and Plaintiff's Argument**

9   54. The ABCMR acknowledged Plaintiff's contention regarding "arbitrary or

10   capricious" standard of the APA. In the Board Discussion Section the ABCMR

11   replied (*See* **Exhibit A, Page 30, 31**):

12       b. The applicant asserts his circumstances mirror the regulatory example

13       cited in the second test in paragraph 7-17. He argues case law and the APA

14       require the ABCMR to consistently decide similar cases or provide

15       distinguishing reasons why it determined one applicant's request was

16       different from another. Additionally, the ADRB did not follow AR 635-200,

17       in that it did not ensure the proper application of the second test in paragraph

18       7-17, AR 635-200, and failed to conduct an inquiry, which would show the

19       applicant was not convicted of fraudulent marriage.

20       (1) The Soldier in the second test example disclosed he might have been

21       convicted of a disqualifying crime; a commander's inquiry found the

22       Soldier was convicted of a lesser, non-disqualifying offense instead. The

23       evidence of record and the applicant's statements do not affirm the

24       applicant ever told the Army he was previously under DHS/DOJ scrutiny

25       for possible immigration law violations, or that his then-spouse had

26       admitted to committing marriage fraud when she and the applicant wed. At

27       the time of his enlistment, paragraph 4-2 (Moral and Administrative

28       Disqualifications), AR 601-210, required recruiters to conduct a suitability

COMPLAINT FOR HEARING ON DISCHARGE UPGRADE AND RELATED CORRECTIONS

determination when there was an indication a potential enlistee had a criminal history; this determination was mandated regardless of disposition, even for cases where the enlistee was released without prosecution. The evidence of record does not reflect the applicant underwent a suitability review prior to enlisting.

(2) The applicant argues, contrary to the second test example where the Soldier was convicted, DHS/DOJ never filed charges against him for marriage fraud, and, because the 5-year statute of limitations lapsed in October 2012, they never will. The applicant additionally provides evidence that, in 2013, USCIS approved him for U.S. citizenship. USCIS's action followed the applicant's citizenship request, which he submitted while on active duty, and for which the basis was his military service; in addition, it came after the applicant's lawsuit against USCIS was settle in his favor. On 23 May 2013, he was naturalized as a U.S. citizen.

(a) The final CID report of investigation stated CID and USCIS had sufficient evidence to establish probable cause the applicant had committed fraudulent entry when he fraudulently married Ms. T_ M. L_ to avoid deportation.

(b) The battalion judge advocate's memorandum, Subject: [applicant] Incident of Fraudulent Entry; Executive Summary of Evidence, stated USCIS "indicate(d) that the DOJ did not want to utilize resources to go after a 'little fish.'"

55. In Discussion b(1), the ABCMR explained that Plaintiff's case was different from the example and therefore the result was different. However, the difference provided by the ABCMR was irrelevant and immaterial.

(i) Plaintiff's discharge was based on "fraudulent marriage", and not based on "DHS/DOJ scrutiny for possible immigration law violations". (emphasis added) Plaintiff did not argue the "scrutiny" issue and the ABCMR should

COMPLAINT FOR HEARING ON DISCHARGE UPGRADE AND RELATED CORRECTIONS

not create new reasons for this discharge case.

(ii) The ABCMR mentioned "that his <u>then-spouse</u> had admitted to
committing marriage fraud when she and the applicant wed". (emphasis
added) The word "<u>then-spouse</u>" indicates the ABCMR admitted this
marriage was not illegal in spite of what she said. Plaintiff's then-spouse was
a drug user and had mental problem and her words were not under oath.
Also Plaintiff did not know his then-spouse admitted to committing marriage
fraud until he was informed during the Army CID interview.

(iii) The ABCMR said "The evidence of record ... do not affirm the
applicant ever told the Army he was previously under DHS/DOJ scrutiny ...
or that his then-spouse had admitted to committing marriage fraud ...".
However, there is no evidence to prove that the Soldier in the example ever
told the Army he was previously under <u>scrutiny</u> or that his partner had
admitted to committing burglary together. The example given in the
regulation is "if the Soldier alleged that he/she was convicted of burglary
and placed on probation, inquiries <u>must</u> be made as to whether the Soldier
was <u>actually convicted</u> of burglary. In fact, the Soldier may have initially
been charged with burglary, but the charge may have been reduced to
trespass, which is a minor non-traffic offense for enlistment purposes that is
not disqualifying for enlistment or re-enlistment. To conduct an inquiry
using these tests to establish existence of fraud, a delay of 30 days is
considered reasonable." (emphasis added) Apparently this example focused
on actual conviction of the disqualifying offense. It did not mention
"scrutiny", "investigation", "possible violation" or "probable cause" at all.

(iv) The ABCMR pointed out: because recruiters are required (mandated) to
conduct a suitability review but this document is missing, it is Plaintiff's
fault, and because the suitability review is missing, Plaintiff must have
concealed some information such as the scrutiny. However, there is no proof

COMPLAINT FOR HEARING ON DISCHARGE UPGRADE AND RELATED CORRECTIONS

1    that Plaintiff refused to participate this suitability review. There is no

2    evidence that Plaintiff did not tell the recruiter he was under scrutiny. During

3    the enlistment process, Plaintiff provided a lot of documents and answered a

4    lot of questions and signed several documents. Plaintiff cannot remember all

5    the details. It was the first time that Plaintiff joined the Army and he had no

6    experience. He did what he was told to do. His enlistment documents were

7    checked by the recruiter and authorized persons, and approved by the Army.

8    If there was a missing suitability review, it was not Plaintiff's fault.

9    (v) Plaintiff did not raise the issue regarding the "suitability review" in his

10   application to the ABCMR. The ABCMR should not create new reasons for

11   this discharge case.

12   (vi) Actually Plaintiff did tell his platoon leader he was under investigation

13   for possible immigration law violations, after he went to CID to take the

14   interview on 12/13/2011. He also disclosed that he was not charged and not

15   convicted and therefore "his leadership never preferred charges against him".

16   (*See* **Exhibit A, Page 2, Section a(2)**). Although there is no record, it is

17   reasonable to believe this, because the CID interview took several hours,

18   Plaintiff missed some work and he had to report his platoon leader what

19   happened. Plaintiff could not hide it to his leader because his leader would

20   know the investigation anyway.

21   56.  In Discussion b(2), the ABCMR confirmed there is no actual conviction.

22   "Probable cause" was not the basis for this discharge case.

23                    **V.4 FOURTH CAUSE OF ACTION:**

24   **PLAINTIFF MET THE REQUIREMENTS FOR CITIZENSHIP**

25   **V.4.(a) Plaintiff Applied U.S. Citizenship Only Once and It Was Approved**

26   57.  Plaintiff joined the Army on 16 September 2009, and applied the U.S.

27   citizenship on 28 January 2010. Plaintiff applied the U.S. citizenship only once.

28   58.  The separation authority determined that Plaintiff "did not meet citizen

17

COMPLAINT FOR HEARING ON DISCHARGE UPGRADE AND RELATED CORRECTIONS

1  requirements when he enlisted…" (*See* **Exhibit D, Finding (b)**) That means

2  Plaintiff's application for the U.S. citizenship on 28 January 2010 did not meet

3  immigration requirements and this citizenship application should be denied by the

4  USCIS.

5  59.  However, the separation authority's Finding (b) is contradictory to the fact

6  that Plaintiff's application for the U.S. citizenship on 28 January 2010 was finally

7  approved by the USCIS. Plaintiff took the Oath of Allegiance at a judicial

8  naturalization ceremony which was administered by this Honorable Court and

9  became a U.S. citizen on 23 May 2013.

10  60.  On Plaintiff's Certificate of Naturalization, it said (*See* **Exhibit F**):

11       "The Secretary having found that:

12       DING CHEN (Plaintiff)

13       residing at: SAN GABRIEL, CALIFORNIA

14       having complied in all respects with all of the applicable provisions of the

15       naturalization laws of the United States, being entitled to be admitted as a

16       citizen of the United States, and having taken the oath of allegiance at a

17       ceremony conducted by

18       US DISTRICT COURT CENTRAL DISTRICT

19       at: LOS ANGELES, CALIFORNIA            on: MAY 23, 2013

20       such person is admitted as a citizen of the United States of America.

21       Alejandro N Mayorkas, Director

22       U. S. Citizenship and Immigration Services"

23  **V.4.(b) Defendant's Discussion and Plaintiff's Argument**

24  61.  The ABCMR acknowledged Plaintiff's contention regarding citizen

25  requirements. (*See* **Exhibit A, Page 4, 5**) In the Board Discussion Section the

26  ABCMR replied (*See* **Exhibit A, Page 31, 32, 33**):

27       d. The applicant contends he met citizen requirements when he enlisted; the

28       Army cannot prove its reasons and findings and lacked convincing evidence

1    to support his separation.

2        (1) In his determination memorandum, dated 14 June 2012, the separation

3        authority states, "[applicant] did not meet citizen requirements when he

4        enlisted, and that this requirement (was) of a disqualifying nature for

5        enlistment." In reaching this finding, the separation authority would have

6        applied the preponderance of evidence standard of proof; an underlying

7        misconception in the applicant's argument is that the evidence being

8        considered by the separation authority had to be proved beyond a

9        reasonable doubt.

10        (2) The evidence of record reflects the following recapitulation of events

11        that would have been available for the separation authority's review: ...

12            [Omitted a list of events focused on the possible fraudulent marriage]

13    62.  In Discussion d(1), the ABCMR said "In reaching this finding, the separation

14    authority would have applied the preponderance of evidence standard of proof".

15    However, the separation authority did not mention any specific evidence for his

16    determination.

17    63.  In Discussion d(2), the ABCMR provided a list of events focused on the

18    possible fraudulent marriage and said this list "would have been available for the

19    separation authority's review". Apparently the ABCMR believed the Finding (b)

20    was based on the possible fraudulent marriage which is outside of the Army's

21    jurisdiction.

22    64.  It's unclear if there was other basis for Finding (b), but Finding (b) should be

23    based on Plaintiff's conducts.

24    65.  Plaintiff's conducts could be subsumed under two broad categories. Category

25    (1) Plaintiff's conducts as a civilian, and Category (2) Plaintiff's conducts as an

26    Army soldier.

27    66.  As mentioned before, Defendant do not have jurisdiction to judge Plaintiff's

28    conducts when he was (is) a civilian. The possible fraudulent marriage was outside

of Defendant's jurisdiction. The USCIS determined that Plaintiff's conducts as a civilian met citizen requirements

67. Maybe this Finding (b) was based on Plaintiff's military service (including enlistment). However, the separation authority characterized Plaintiff's entire service (including enlistment) as general under honorable conditions in spite of the "fraudulent entry". Based on immigration law (INA 329), both "honorable" and "general under honorable conditions" discharge types qualify for immigration purposes. Plaintiff obtained his citizenship with this "general under honorable conditions" character determined by the separation authority. Therefore, the separation authority determined that Plaintiff's conducts during his military service (including enlistment) met citizen requirements.

## V.5 FIFTH CAUSE OF ACTION:
## DEFENDANT VIOLATED THE "DUE PROCESS CLAUSE"
## IN THE DISCHARGE PROCESS

### V.5.(a) Plaintiff Believes That His Right Was Violated

68. During the discharge process, Plaintiff consulted with legal counsel in the Army. Plaintiff completed and signed the Election of Rights form. On the form Plaintiff elected to submit statements in his behalf (which is called "matters" in the Army).

69. Plaintiff also requested to present his case before an administrative separation board on the same Election of Rights form, but the legal counsel said this request was likely to be denied, and actually it was denied.

70. Therefore the only opportunity Plaintiff could explain himself was submitting rebuttal statements (matters). Plaintiff was given 7 days to do it. Plaintiff submitted his statement with evidence one day before the deadline.

71. However, when the separation authority made his final determinations and findings, he did not discuss Plaintiff's matters. Also the matters are not available in the record.

COMPLAINT FOR HEARING ON DISCHARGE UPGRADE AND RELATED CORRECTIONS

72.  It's probable that Plaintiff's matters were excluded and were not reviewed by the separation authority. If that is the case, essentially Plaintiff's right to submit statements in his behalf was violated, and the Army violated the "Due Process Clause" of the Constitution.

**V.5.(b) Defendant's Discussion**

73.  The ABCMR acknowledged Plaintiff's contention regarding due process rights. (*See* **Exhibit A, Page 8**) In the Board Discussion Section the ABCMR replied (*See* **Exhibit A, Page 33**):

> e. The Army violated the applicant's due process rights by not allowing him to present his case to either an administrative separation board and/or a court-martial. He also asserts there was no proof the evidence he submitted was ever considered by the separation authority.

> (1) By regulation, Soldiers with less than 6 years total active duty and Reserve Component service were not entitled to present their case before an administrative separation board. In addition, the regulation stipulated the commander's use of the notification procedure when the circumstances did not warrant an under other than honorable conditions character of service.

> (2) Among the rights available to Soldiers under the notification process were the right to consult with military counsel and to submit statements in his/her own behalf. After consulting with counsel, the regulation indicated the Soldier was to complete and sign the Election of Rights, and submit any evidence he/she wanted the separation authority to consider; this document, along with the Soldier's evidence, was to be included in the Soldier's separation packet. In the applicant's case, the separation packet is void of his Election of Rights document and the evidence he contends he submitted.

74.  In Discussion e(1), the ABCMR said Plaintiff was not entitled to a separation

1    board. Therefore the only way Plaintiff could explain himself is submitting

2    statements and evidence (matters).

3    75.  In Discussion e(2), the ABCMR said Plaintiff's matters were not available in

4    the record. It seems the ABCMR did not think there was anything wrong, or maybe

5    the ABCMR wanted to say because there is no record, there is no proof that the

6    Army did anything wrong, and either Plaintiff waived his right to submit

7    statements or it was Plaintiff's fault that those documents are missing.

8    **V.5.(c) Legal Standard of Review**

9    76.  32 C.F.R. § 581.3(e)(2) provides "The ABCMR begins its consideration of

10    each case with the presumption of administrative regularity. The applicant has the

11    burden of proving an error or injustice by a preponderance of the evidence. "

12    77.  The presumption of regularity means that the Board will assume that all

13    official acts by the Army have been in accordance with the applicable laws,

14    regulations, and directives.

15    78.  The burden is on Plaintiff to prove an error or injustice. "By a preponderance

16    of the evidence" means it's not necessary for Plaintiff to prove beyond a

17    reasonable doubt. There could be two or more possible situations, and Plaintiff

18    only need to prove that one possible situation (an error or injustice) was more

19    probable than the other (others).

20    **V.5.(d) Plaintiff's Response (or "No Response") Should Be Recorded. "No**

21    **Record" Itself Indicates Administrative Irregularity**

22    79.  AR 635-200 2-2 provides:

23       e.(1) If the Soldier elects to waive his/her rights, the Soldier will personally

24       sign a waiver.

25       ...

26       (3) If the Soldier refuses to consult with counsel and/or declines to respond

27       as to the waiver of rights, such declination will constitute a waiver of rights.

28       An appropriate notation will be made on the form provided for the Soldier's

COMPLAINT FOR HEARING ON DISCHARGE UPGRADE AND RELATED CORRECTIONS

1    reply.

2    (4) If the Soldier indicates that one or more of the rights will be exercised

3    but declines to sign the appropriate form, the selection of rights will be noted.

4    An appropriate notation as to the failure to sign will be made.

5    ...

6    g. If notice by mail is authorized and the Soldier fails to acknowledge receipt

7    or submit a timely reply, that fact will constitute a waiver of rights. An

8    appropriate notation will be recorded on a retained copy of the appropriate

9    form.

10   80.  Therefore if the Army followed Army Regulation 635-200 2-2, no matter

11   Plaintiff consulted with counsel or not, no matter Plaintiff signed a waiver or not,

12   no matter what response Plaintiff gave or no response at all, there should be

13   something in the record.

14   81.  However, there was nothing in the record and Defendant did not think it was

15   a problem. In the denial letter from the Army Discharge Review Board (ADRB), in

16   the SEPARATION FACTS AND CIRCUMSTANCES Section (*See* **Exhibit B,**

17   **Page 3**), the ADRB said "Although the applicant's response with making his

18   election of rights pursuant to consulting with legal counsel, being advised of the

19   impact of the discharge action, and electing whether he was submitting a statement

20   on his behalf is not available in the record. Subsequently, the unit commander

21   recommended separation from the Army." In the DISCUSSION AND

22   RECOMMENDATION Section (*See* **Exhibit B, Page 7**), the ADRB said "The

23   record does not contain any indication or evidence of arbitrary or capricious

24   actions by the command and all requirements of law and regulation were met and

25   the rights of the applicant were fully protected throughout the separation process".

26   (emphasis added)

27   82.  Apparently it is more probable than not that there was something wrong in

28   the discharge process. The Army did not follow AR 635-200 2-2. If "no record"

means "no misconduct", it is to encourage the Army not to keep any record.

83. 5 U.S. Code § 706(2)(D) Administrative Procedure Act provides: "The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... without observance of procedure required by law" .

**V.5.(e) It's More Probable That Plaintiff Didn't Waive the Right To Submit Matters and He Did Submit Matters**

84. AR 635-200 2-2. provides:

> c. ... The Soldier will be further advised of the following rights:
>
> ...
>
> (2) To submit statements in his/her own behalf.
>
> ...
>
> (5) To waive the above rights in writing ... Failure to respond within 7 duty days will constitute a waiver of the rights in (1) through (5), above.
>
> ...
>
> h. The Soldier <u>may withdraw his/her waiver of rights</u> listed in c(1) through (5), above, at any time prior to the date the separation authority orders, directs, or approves the separation. (emphasis added)

85. It means Plaintiff had the right to submit statements in his behalf. There is no evidence that Plaintiff ever waived this right.

86. Even if he waived this right, he may withdraw his waiver of right before 06/14/2012 which is the date the separation authority approved the separation.

87. In the E-mail Correspondence in the Record (subject: FW: Follow Up/Ding Chen), (*See* **Exhibit C, Page 3**) on 29 MAY 2012, 9:25AM, CPT Christopher (a battalion judge advocate) wrote to USCIS Officer Kari San Miguel: "Good morning Kari, Yes, we have initiated separation against the Soldier (Plaintiff). He has until 30 May 12 to submit matters for the Group Commanded (Commander) to consider before making a separation decision. My best guess is that he should be separated on/about 15-22 June 12 for fraudulent enlistment, barring some

24

significant currently unknown information brought to our attention by the Soldier in his matters."

88.  In this E-mail CPT Christopher did not say Plaintiff waived his right to submit matters. This E-mail clearly indicates that CPT Christopher knew Plaintiff would submit matters. Actually Plaintiff even asked CPT Christopher some questions regarding the preparation of matters before he submitted them.

89.  Then on the same day (29 MAY 2012), 2:45PM, CPT Christopher wrote to USCIS Officer Kari San Miguel: "Kari, SPC Chen submitted copies of his employment authorization cards…The relevant card is valid from 5/17/09 to 5/16/10. He enlisted on 07/28/09. SPC Chen submitted this document to his recruiter, and the doc was verified by USCIS on Form G-845…" (*See* **Exhibit C, Page 2, 3**)

90.  Apparently Plaintiff did submit his matters and provide meaningful explanation of his legal status in U.S. when he joined the Army. Actually there were other pieces of evidence in his matters. CPT Christopher mentioned Plaintiff's matters on 05/29/2012 which is one day before 05/30/2012 (the deadline mentioned by CPT Christopher), and more than two weeks before 06/14/2012 (the date the separation authority approved the separation).

**V.5.(f) It's More Probable That Separation Authority Did Not Review Plaintiff's Matters**

91.  Plaintiff submitted his employment authorization cards (which were never canceled or revoked) to prove he was legal to stay in U.S. when he joined the Army; however the separation authority still found that Plaintiff was illegal to stay in U.S. at that time.

92.  When the separation authority made his final determinations and findings, he said "In accordance with AR 635-200, ch. 7, I make the following findings based on investigations conducted by the Department of Homeland Security Immigration and Customs Enforcement (Case Number SF17ER06SF0033) and U.S. Army

COMPLAINT FOR HEARING ON DISCHARGE UPGRADE AND RELATED CORRECTIONS

1 | Criminal Investigation Division (Report of Investigation 0998-2011-CID016-
2 | 46264-8D1/5M3C)". (*See* **Exhibit D**) He did not discuss Plaintiff's matters. He did
3 | not even mention them.

4 | 93.  Also the matters were not included in the evidence, and were not included in
5 | Plaintiff's separation packet. They just disappeared, as if they never existed.

6 | 94.  Plaintiff believes the separation authority did not review Plaintiff's matters at
7 | all. It's also possible that the separation authority did review the matters but did not
8 | mention it, and then somehow the matters were not included in the record. The
9 | question is: which situation is more probable?

10 | 95.  The AR 635-200 2-3 provides "The action of the separation authority will be
11 | recorded". However, there is no record that the separation authority ever reviewed
12 | or received Plaintiff's matters.

13 | 96.  The ABCMR said "... Election of Rights ... along with the Soldier's evidence,
14 | was to be included in the Soldier's separation packet". If the separation authority
15 | received Plaintiff's matters, it should be included in Plaintiff's separation packet,
16 | just like other documents (especially the E-mail Correspondence which was
17 | written after Plaintiff submitted his matters, *See* **Exhibit C**) in the separation
18 | packet.

19 | 97.  Therefore it is more reasonable to believe that the separation authority did not
20 | review Plaintiff's matters.

21 | **V.5.(g) It's More Probable That Defendant Violated "Due Process Clause" in**
22 | **the Discharge Process**

23 | 98.  Plaintiff had the right to submit statements in his own behalf (matters).
24 | However, the "right to submit" means the matters should be admitted into the
25 | evidence, and the matters should be forwarded to the separation authority to
26 | consider. In the E-mail Correspondence in the Record (subject: FW: Follow
27 | Up/Ding Chen), (*See* **Exhibit C**), CPT Christopher mentioned "he (Plaintiff) has
28 | until 30 May 12 to submit matters <u>for the Group Commanded (Commander) to</u>

1  <u>consider</u> before making a separation decision." (emphasis added). It clearly
2  indicates CPT Christopher knew Plaintiff's matters should be forwarded to group
3  commander (the separation authority).

4  99.  It was more probable than not that Plaintiff submitted his matters and the
5  matters was discarded by somebody, therefore Plaintiff's right to submit matters
6  was violated.

7  100.  If the separation authority was provided a copy of Plaintiff's matters before
8  he made final determinations and findings, maybe the result would be different.
9  Maybe Plaintiff would not be discharged, or maybe he would be discharged with
10  honorable character.

11  101.  Essentially the Army did not follow the "Due Process Clause" during this
12  discharge process. 5 U.S. Code § 706(2)(B) Administrative Procedure Act provides:
13  "The reviewing court shall ... hold unlawful and set aside agency action, findings,
14  and conclusions found to be ... contrary to constitutional right, power, privilege, or
15  immunity" .

### VI. SIXTH CAUSE OF ACTION:
### PLAINTIFF'S SERVICE SHOULD BE UPGRADED TO HONORABLE

18  102.  In Plaintiff's application to the ABCMR, he requested to upgrade his service
19  characterization to honorable.

20  103.  Plaintiff discussed the ADRB's reply. The ADRB said "Army Regulation
21  635-200, paragraph 3-7a…The honorable characterization is appropriate when the
22  quality of the member's service generally has met the standards of acceptable
23  conduct and performance of duty…Whenever there is doubt, it is to be resolved in
24  favor of the individual." (*See* **Exhibit B, Page 5, 6**)

25  104.  Plaintiff's service generally has met the standards of acceptable conduct and
26  performance of duty. Plaintiff obtained two Certificates of Appreciation from the
27  Army. (*See* **Exhibit G**) Plaintiff got no other punishments during his service
28  except only one negative counseling statement which was for the possible

1   fraudulent entry. Now there is doubt about the "fraudulent entry", therefore it
2   should be resolved in favor of Plaintiff.

3   105.  Plaintiff also cited precedent cases reported by the Army Times. The Army
4   has upgraded stigmatizing "general discharges" of three soldiers it forced out
5   without giving them a chance to plead their cases. (*See* **Exhibit E**, all 3 cases were
6   in the Court of Federal Claims, the cases are: *Gonzalez v. United States,* 44 Fed. Cl.
7   764 (1999), *VIERNES v. USA,* 1:98-cv-00308-JPW, *DINOVO, et al v. USA,* 1:97-
8   cv-00085-LJB).

9   106.  Similarly, in this discharge case, it is more probable than not that Plaintiff's
10  right to plead his case was denied. This discharge process was not fair and it
11  violated the "Due Process Clause" of the Constitution. The Army should follow the
12  precedent cases and upgrade Plaintiff's discharge.

13  107.  The ABCMR acknowledged Plaintiff's request to upgrade his service
14  characterization on these two grounds (*See* **Exhibit A, Page 7, Section (e); Page 8,**
15  **Section (6)(b)**). However, the ABCMR did not give a reply.

**REQUEST FOR RELIEF**

17  108.  Based on the foregoing, Plaintiff respectfully requests that the Court grant
18  him the following relief:

19        1) Enter judgment in his favor on all counts;
20        2) Remand the matter to the ABCMR for further action consistent with the
21        Court's decision and order;
22        3) Upon proper application, award Plaintiff court fees and attorney fees in
23        accordance with the Equal Access to Justice Act;
24        4) Assign all costs associated with this action to Defendant; and
25        5) Any other relief that he may be entitled to.

27  Dated: 03-23-2022            *Ding Chen*

28                               DING CHEN

28

**EXHIBIT LIST**

COMPLAINT FOR HEARING ON DISCHARGE UPGRADE
AND RELATED CORRECTIONS

Plaintiff: Ding Chen

Exhibit A: Reply from Army Board for Correction of Military Records (ABCMR)

Exhibit B: Reply from Army Discharge Review Board (ADRB) (*Redacted*)

Exhibit C: E-mail Correspondence (subject: FW: Follow Up/Ding Chen) (*Redacted*)

Exhibit D: Separation Authority's Determinations and Findings

Exhibit E: News from Army Times

Exhibit F: Plaintiff's Certificate of Naturalization (*Redacted*)

Exhibit G: Certificates of Appreciation from the Army

1
2
3
4
5
6
7
8                              Exhibit A
9
10
11      Reply from Army Board for Correction of Military Records (ABCMR)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**DEPARTMENT OF THE ARMY**
ARMY BOARD FOR CORRECTION OF MILITARY RECORDS
251 18TH STREET SOUTH, SUITE 385
ARLINGTON, VA  22202-3531

October 20, 2020

AR20190010839, Chen, Ding

Mr. Ding Chen
1118 E Emerson Avenue
Monterey Park CA 91755

Dear Mr. Chen:

I regret to inform you that the Army Board for Correction of Military Records denied your application.

The Board considered your application under procedures established by the Secretary of the Army.  I have enclosed a copy of the Board's Record of Proceedings.  This decision explains the Board's reasons for denying your application.

This decision in your case is final.  You may request reconsideration of this decision letter to the above address only if you can present new evidence or argument that was not considered by the Board when it denied your original application.

Sincerely,

X _____
Dennis Dingle
Director
Signed by: DINGLE.DENNIS.WILLIAM.1073592077

Enclosure

Printed on ♻ Recycled Paper

ARMY BOARD FOR CORRECTION OF MILITARY RECORDS

RECORD OF PROCEEDINGS

IN THE CASE OF:  Chen, Ding

BOARD DATE:  3 December 2019

DOCKET NUMBER:  AR20190010839

APPLICANT REQUESTS:

- Upgrade of his general discharge under honorable conditions to honorable
- In effect, correction of his DD Form 214 (Certificate of Release or Discharge from Active Duty) by revising item 26 (Separation Code) to "JFF," changing item 27 (Reentry (RE) Code) to RE-1 (Eligible to Reenlist without Waiver), and amending item 28 (Narrative Reason for Separation) to "Secretarial Authority"

APPLICANT'S SUPPORTING DOCUMENTS CONSIDERED BY THE BOARD:

- DD Form 149 (Application for Correction of Military Record)
- DD Form 214
- Table of Contents for applicant's arguments
- Exhibits 1 – 16  List:

    - Exhibit 1 – DD Form 214
    - Exhibit 2 – Notice Letter from USCIS (U.S. Citizenship and Immigration Services) for Naturalization Interview
    - Exhibit 3:  Exhibit 3A – Naturalization Application Receipt and Interview Results; Exhibit 3B – Recent Responses from USCIS; Exhibit 3C – Applicant's Military Identification Card and Certificates of Appreciation
    - Exhibit 4 – USCIS Form N-445 (Notice of Naturalization Oath Ceremony); Certificate of Naturalization; U.S. Passport
    - Exhibit 5 – Army Discharge Review Board (ADRB) denials in 2014 and 2017
    - Exhibit 6 – Pictures (a total of 12, from wedding, when applicant lived with ex-wife, and Naturalization Oath Ceremony)
    - Exhibit 7 – Four affidavits from applicant's landlord, a doctor, and a friend
    - Exhibit 8 – Army Times article
    - Exhibit 9 – Bank statement and tax documents
    - Exhibit 10 – Airplane tickets for applicant and ex-wife
    - Exhibit 11 – Envelopes showing correspondence with ex-wife and ex-mother-in-law while applicant was in basic combat training

ABCMR Record of Proceedings (cont)                              AR20190010839

- Exhibit 12 – Applicant's Employment Authorization Document Card (EAD) and USCIS Form G-845 (Document Verification Request)
- Exhibit 13 – USCIS webpage for USCIS Form I-130 (Petition for Alien Relative)
- Exhibit 14 – Permit for Controlled Chemical Substances
- Exhibit 15 – News of ICE (Immigration and Customs Enforcement) arresting illegal immigrants
- Exhibit 16 – Recommendation letters

## FACTS:

1. The applicant did not file within the 3-year time frame provided in Title 10 (Armed Forces), United States Code (USC), section 1552 (b) (Correction of Military Records: Claims Incident Thereto). However, the Army Board for Correction of Military Records (ABCMR) conducted a substantive review of this case and determined it is in the interest of justice to excuse the applicant's failure to timely file.

2. The applicant states, during the discharge process, and later in the ADRB review, the Army committed "errors and misconducts." He asserts the Army lacked: jurisdiction, related knowledge and experience, proper instructions, reliable grounds, and convincing evidence to support the allegations that resulted in his discharge. Further, the Army failed to follow the "Due Process Clause." As to the ADRB, it did not comply with either the requirements of Army Regulation (AR) 635-200 (Active Duty Enlisted Administrative Separations) or standards, as they pertain to "arbitrary and capricious" decisions, that are outlined in the APA (Administrative Procedure Act, Title 5 (Government Organization and Employees), subchapter II (Administrative Procedure)). The applicant submits additional arguments in a 37-page document, in which he writes the following:

   a. He describes some of his personal history, beginning with his Regular Army enlistment in 2009.

      (1) He entered the Army via the Military Accessions Vital to National Interest (MAVNI) program (a Department of Defense initiative designed to recruit legal/nonimmigrant aliens (i.e. not permanent residents) with special language/cultural backgrounds). When he enlisted, he provided all of the required immigration documents to his recruiter; at the time, his immigration status hinged on his marriage to a U.S. citizen.

      (2) He had served on active duty for more than 2 years when the U.S. Army Criminal Investigation Command (CID) launched an investigation into USCIS allegations that he had fraudulently enlisted into the Army. After CID completed its investigation, his leadership never preferred charges against him; nonetheless, in May 2012, his unit

2

ABCMR Record of Proceedings (cont)                                  AR20190010839

commander initiated separation action against him for "Fraudulent Enlistment" and "False Official Statement."  He contends, during the separation process, the Army erred by not letting him present his case before an administrative separation board and/or a court-martial.  On 29 June 2012, the separation authority discharged him under honorable conditions (general).

(3)  After he left the Army, USCIS interviewed him because of his pending U.S. citizenship application.  USCIS told him, while they were not denying his application, they were unable to make an immigration determination; he decided to sue USCIS.  His case was settled, USCIS subsequently approved his citizenship application, and, on 23 May 2013, he became a naturalized U.S. citizen.

b.  The applicant submits reasons why the Board should accept his application, despite the expiration of the ABCMR's 3-year statute of limitations.  He also provides language from the U.S. Code and gives a definition of the presumption of regularity.

c.  He asserts the ADRB committed misconduct and numerous legal errors when it failed to appropriately address his case; in addition, his discharge and the ADRB's two denials were unlawful.  He offers nine arguments:

(1)  The Army lacked jurisdiction to determine whether his marriage was fraudulent.

(a)  The applicant quotes wording from his commander's notification of separation memorandum; the applicant then references a memorandum, signed by the separation authority, dated 14 June 2012, and having the Subject: [applicant] Incident of Fraudulent Entry Determinations and Findings.  The applicant asserts, in effect, his chain of command discharged him "based on a possible fraudulent marriage"; however, if the evidence were to show his marriage was actually bona fide, then the Board would necessarily have to conclude the visa used to support his enlistment was valid, and his immigration status was legal; this would likewise mean he made no false representations during the enlistment process

(b)  Regarding his claim the Army lacked the necessary jurisdiction to determine whether his marriage was fraudulent, the applicant emphasizes the separation authority's findings were based solely on the "possibility" the applicant's marriage was fraudulent; he further notes the "possible fraudulent marriage occurred and was complete(d) before (he) joined the Army."  This is important because, he asserts, the Army cannot assume jurisdiction over an offense allegedly committed while he was still a civilian.  In support of his jurisdiction argument, the applicant:

3

ABCMR Record of Proceedings (cont)                          AR20190010839

- Quotes a portion of the Immigration and Nationality Act (Title 8, U.S. Code), wherein it lists the legal penalties for anyone who knowingly enters into a marriage to evade immigration law
- Cites case law that states a "fraudulent marriage is not a continuing crime"; and is "complete on the date of the marriage"; although he was still married in 2009, his allegedly fraudulent marriage was "completed" in 2007, at a point when he had no connection to the Armed Forces
- References a U.S. Supreme Court case that essentially affirms the military cannot exercise court-martial authority over civilians
- Notes the APA provision that states a sanction cannot be impose unless jurisdiction has been properly delegated (Title 5, U.S. Code, section 558 (Imposition of Sanctions; Determination of Applications for Licenses; Suspension, Revocation, and Expiration of Licenses)

(2)  The separation authority did not affirm the finding of false official statement.

(a)  The applicant argues, while his unit commander identified the rendering of a false official statement as one of the bases for initiating separation action, the separation authority did address it in his final determination (apparently referring to the earlier-referenced 14 June 2012 memorandum, Subject: [applicant] Incident of Fraudulent Entry Determinations and Findings).  The applicant maintains, due to the presumption of administrative regularity, the Board "should not assume that the Applicant committed False Official Statement."

(b)  He further asserts, in effect, the ADRB acted improperly when it opted not to change his separation, and determined the applicant's discharge was proper and equitable.

(3)  The applicant met citizen requirements when he enlisted.

(a)  The applicant quotes one of the separation authority's findings, taken from the earlier-referenced fraudulent entry determinations and findings memorandum; in it, the separation authority stated:  "That [applicant] did not meet citizenship requirements when he enlisted, and that this requirement is of a disqualifying nature for enlistment."  The applicant opines the wording is confusing, and contends, what the separation authority really meant was the applicant "should (have met) the immigration requirements to be a U.S. citizen when he enlisted, but he did not, therefore he was not qualified for enlistment (through the MAVNI program)."  The applicant asserts, contrary to this latter interpretation, the MAVNI enlistment criteria did not say he had to be a U.S. citizen.  He cites a U.S. Army Special Operations Command (USASOC) memorandum, dated 10 June 2009, which addresses the assignment of foreign-born Soldiers to USASOC, and specifically states the Secretary of Defense approved the recruitment of legal aliens.

4

ABCMR Record of Proceedings (cont)                    AR20190010839

(b)  The applicant points out his Regular Army enlistment was in September 2009; by the time he applied for U.S. citizenship in January 2010, he had already served honorably for more than 2 years.  In Part 2 of his application, the applicant showed he was applying for citizenship because of qualifying military service.  (Section 329 of the Immigration and Naturalization Act states members of the U.S. Armed Forces who have served honorably during designated periods of hostilities, including after 11 September 2001, may be eligible to naturalize; they must have been living within the U.S., either as a lawful permanent resident or were physically present at the time of enlistment, and be able to demonstrate good moral character, be well disposed to the good order and happiness of the U.S., and show an attachment to the principles of the U.S. Constitution).

(c)  The applicant again points to the separation authority's determinations and findings memorandum, asserting, if the separation authority's above-cited finding was correct, the applicant's citizenship application should then have been denied by USCIS; instead, his citizenship application was subsequently approved and he was naturalized.

(4)  The Army cannot prove its reasons and findings, with regard to his discharge.  While the Board will presume regularity as to the separation authority's reasons and findings, neither are supported by evidence:

(a)  As stated above, the notification memorandum's Reason Number 2 (False Official Statement), should be voided by virtue of the separation authority's failure to address it in the determinations and findings memorandum.

(b)  As to Reason Number 1 (Fraudulent Entry), the notification memorandum essentially alleged:  the applicant procured his enlistment through deliberate misrepresentation; made false representations that he (the applicant) was legally in the U.S., and based his presence in the U.S. on a fraudulent marriage; and that the applicant then illegally accepted pay and allowances as a result of his fraudulent enlistment.  The applicant maintains, in reality:  he knowingly made a statement that he was legally in the U.S. because he had a valid EAD, the EAD was never revoked, and he was neither charged nor convicted by a Federal court for the crime of fraudulent marriage.

(c)  The applicant asserts the "Army officers could not by themselves determine if the applicant committed fraudulent marriage."  He contends the separation authority's judgment on this matter was invalid; this was because the separation authority was unfamiliar with immigration law.  According to the U.S. Supreme Court, the Army's primary business does not include judging whether, at the time of the marriage, the applicant intended to establish a life with his now-former spouse.

ABCMR Record of Proceedings (cont)                              AR20190010839

    (d)  The Board should not consider USCIS as a reliable source of information; during his lawsuit against USCIS, the USCIS and/or the District Attorney could have filed a motion to dismiss his suit; instead, the government settled his case.  The applicant asserts this outcome, and his subsequent naturalization, prove it is more probable than not that the government settled his case because, during the course of their investigation against him, USCIS did something that violated immigration law.  This alone should be enough for the Board to deem the USCIS as unreliable, but the applicant additionally argues, during the investigation and discharge process, the USCIS officer in charge of his case acted unreliably by giving an unreasonable explanation.  The applicant acknowledges USCIS made the allegation of fraudulent marriage against the applicant, but "anyone could make allegations, and the USCIS could make mistakes and even violate its own regulation."  In the final analysis, the Board should give more weight to the fact the Director, USCIS signed the applicant's naturalization certificate, and thereby validated the applicant had "complied in all respects with all of the applicable provisions of the naturalization laws of the U.S."  The Board should also find the USCIS director's aforementioned determination should be accepted as more reliable than any evidence offered by a subordinate USCIS officer.

    (5)  The ADRB did not follow AR 635-200.

    (a)  Paragraph 7-17 (Incident of Fraudulent Entry) of AR 635-200 requires the separation authority to apply two tests, when determining if an enlistment is fraudulent.  In the second test, the commander must verify the existence and true nature of the apparent disqualifying information; such verification may ultimately reveal the enlistee was actually not disqualified and, thus, no fraud occurred.  The applicant describes the example given in the regulation, wherein it states, "if the Soldier alleged that he/she was convicted of burglary and placed on probation, inquiries must be made as to whether the Soldier was actually convicted of burglary.  In fact, the Soldier may have initially been charged with burglary, but the charge may have been reduced to trespass, which is a minor non-traffic offense for enlistment purposes that is not disqualifying for enlistment or re-enlistment."

    (b)  The applicant essentially contends, in the foregoing example, it is beyond reasonable doubt that the Soldier committed trespass, since he/she was convicted; it is additionally probable the Soldier committed burglary, given the initial charge.  Significantly, because the Soldier was not convicted of burglary, he/she cannot be discharged for fraudulent entry.  In requiring the commander to conduct an inquiry, the regulation does not state the commander should verify the existence or true nature of the burglary charge, even when the available evidence is sufficient to prove that it was more likely than not that the Soldier committed the crime.  The applicant argues this is because the alleged burglary occurred before the Soldier's enlistment and, at that time, the Army did not have jurisdiction.  In addition, the regulation does not say the commander should depend on another agency's opinion or judgment, when verifying

ABCMR Record of Proceedings (cont)                    AR20190010839

the actual offense (apparently inferring the separation authority should not consider input from USCIS).

(c)  In the applicant's case, the separation authority, and/or the ADRB, should have made inquiries as to whether the applicant was actually convicted of fraudulent marriage; the applicant maintains the Board should now conduct such an inquiry.  The inquiry's findings would reveal the applicant was never convicted, and, because the 5-year statute of limitations has lapsed, the applicant will never face a Federal charges for fraudulent marriage.  While it is clear the ADRB confirmed the separation authority's determinations, the applicant argues the Board should consider that "at least it is possible (he) did not commit fraudulent marriage"; assuming this possibility, he contends the separation authority should not have discharged him.

(d)  He states, in effect, both the Army and the ADRB did not afford him his right to the presumption of innocence, and he asserts the Army's determinations alone do not overcome this presumption.  He asserts the Army bore the burden of overcoming this presumption, and, in apparent contravention of the presumption's precepts, the ADRB seemed to want the applicant to prove his innocence.  The applicant opines the separation authority gave him a general discharge because he anticipated the applicant would eventually be charged with and convicted of immigration fraud; of course, this did not happen.  The applicant maintains, ultimately, it cannot be proven whether he did, or did not he did commit this crime.  In any case, the Army failed to establish his marriage was fraudulent, and the fact he was naturalized should confirm for the Board that his discharge was invalid; he should not have been penalized for what was clearly a questionable and contested act of fraud.

(e)  In effect, the applicant maintains, as outlined in paragraph 3-7a (Honorable Discharge) of AR 635-200, the overall quality of his service was honorable because it generally met the Army's standards for acceptable conduct and duty performance; the Board should find in his favor and grant his requests because he has raised what he believes are valid doubts about his discharge.

(f)  The ADRB failed to explain how the separation authority fulfilled the regulation's second test, as outlined in paragraph 7-17; the applicant reiterates his arguments regarding jurisdiction, and asserts the Army must at least depend on something tantamount to an actual conviction, or show that the alleged crime can be proved beyond a reasonable doubt.  Neither of these two conditions were met in his case and, as a result, the ADRB's denial decisions should be set aside.

(g)  The ADRB was unfair in its treatment of his evidence.  He provided the ADRB four notarized affidavits, all dated prior to his enlistment.  The ADRB stated, in effect, because the affidavits seemed to be part of an investigation that pre-dated the applicant's entry on active duty, the ADRB deemed them as insufficiently compelling to

7

ABCMR Record of Proceedings (cont)                          AR20190010839

overcome the presumption of regularity. If the ADRB had applied this same standard to other evidence (one based on when the evidence was created), it would necessarily have concluded Department of Homeland Security's (DHS) report of investigation (also generated prior to his enlistment) was equally uncompelling; the ADRB should also have determined the DHS report was insufficient to overcome the applicant's presumption of innocence. The fact is, the DHS report was the only real evidence the separation authority had to substantiate the applicant's possible marriage fraud; all other pieces of evidence, in the applicant's view, were irrelevant. The manner in which the ADRB treated his affidavit evidence, when coupled with his argument about the DHS report's inability to overcome his presumption of innocence, should give the Board the necessary basis to find his contested fraudulent marriage cannot be proved and he should never have been discharged.

(6) The Army violated the applicant's due process rights.

(a) A Soldier pending separation action should be given the opportunity to explain himself; as was his right, the applicant submitted matters in his own behalf. In email correspondence between the battalion judge advocate and the applicant's USCIS case officer, the battalion judge advocate essentially acknowledges the applicant submitted documents, but, the applicant points out, those documents are no longer part of his separation packet. As such, it is not clear whether his submissions were ever made available to the separation authority before the decision to discharge was made; the applicant notes the separation authority did not mention his evidence, and, he asserts, it is more likely than not that the separation authority never saw what he submitted. In support of this assertion, he notes, while his evidence is missing, his separation packet does include the aforementioned email correspondence.

(b) The applicant argues, assuming what he asserts is correct, the separation authority did not afford the applicant a proper review of his case prior to directing discharge. The applicant cites Army Times reporting about two Soldiers who served in the 1990's, and who were discharged without being given the chance to plead their cases; the Army approved upgrades for both. He affirms he asked to appear before an administrative separation board, but his request was denied; the Army's denial of his due-process rights should be yet another reason to upgrade his character of service.

(7) The USCIS case officer gave improper instructions.

(a) CID stated its investigation resulted from a USCIS report claiming the applicant had fraudulently enlisted. Neither CID nor the applicant's chain of command were familiar with immigration law; as such, it was the USCIS case officer's responsibility to properly educate both; the USCIS case officer failed to do so, and her misconduct affected the outcome of the applicant's case.

ABCMR Record of Proceedings (cont)                                      AR20190010839

(b)  Nowhere in the applicant's separation packet did his leadership offer the
legal definition of a fraudulent marriage.  The investigation focused on the following:
whether the applicant and his former-spouse lived together; if money was involved; was
the marriage's purpose to circumvent immigration law; and was a matchmaker utilized.
Reasonably, the applicant's chain of command could conclude the marriage was
fraudulent if the couple did not live together, money was involved, the marriage's
purpose was to evade immigration law, and a matchmaker had brought the couple
together.  However, the applicant contends, "By law, even if the couple did not live
together and a matchmaker arranged this marriage for immigration purpose, and there
was money involved, the marriage was not necessarily fraudulent."

(c)  He requotes Title 8, U.S. Code, wherein in it essentially states anyone who
knowingly marries for the purpose of evading immigration laws is subject to a fine and
imprisonment.  He goes on to cite case law, stating, in effect, the key question is
whether the person applying for citizenship, and his wife, intended to establish a life
together after marrying.  "The concept of establishing a life as marital partners contains
no Federal dictate about the kind of life that the partners may choose to lead.  Any
attempt to regulate their lifestyles, such as prescribing the amount of time they must
spend together, or designating the manner in which either partner elects to spend his or
her time, in the guise of specifying the requirements of a bona fide marriage, would
raise serious constitutional questions."

(d)  Citing a 1986 Harvard Law Review article titled The Constitutionality of the
INS (Immigration and Naturalization Service) Sham Marriage Investigation Policy, the
applicant further maintains marriage fraud can be either unilateral (where only one party
commits fraud) or bilateral (where both parties participate).  In the applicant's case, the
prosecutor had the burden of proving the applicant never intended to establish a life
with his ex-wife; however, no one ever asked about this and USCIS never proved it.
Despite the USCIS case officer's active participation in both the investigation and
discharge process, she never gave the legal definition of a fraudulent marriage, and the
separation authority was not provided proper instruction on this matter.  The applicant
offers possible reasons for this omission, to include the speculation that the case officer
simply did not know the definition.

(e)  The applicant proposes once more, "but at least it is possible" his marriage
was not fraudulent.  Both during the 2008 DHS investigation, and again with CID, the
applicant affirmed he got married because he loved his ex-wife.  It seems, the applicant
notes, few people in the Army want to believe him; he contends it is nonetheless
"possible" he told the truth, in that he really loved his ex-wife, and he fully intended to
establish a life with her.  The applicant references pictures he included as evidence, and
describes how they met, his feelings for her, and that, after marriage, they established
joint bank accounts and filed taxes together; he additionally offers details about their life

ABCMR Record of Proceedings (cont)                                     AR20190010839

together.  It was only after he learned she was a drug user that they separated.  He
states he tried to help her, but he failed; they divorced in 2010.

(f)  The applicant restates his earlier argument pertaining to the commander's
allegation of a false official statement, and provides the allegation's Uniform Code of
Military Justice (UCMJ) definition.  He points out one of the elements of proof for the
UCMJ violation is that the government must show the intent to deceive.  He indicates
the CID special agent's (SA) report stated the applicant lost his ability to speak English
when asked about money, and he required the assistance of an agent who spoke
Mandarin.  The applicant asserts, his English was poor and the statement itself was
immaterial; he further argues the immateriality of the statement indicates the absence of
any intent to deceive.  The applicant then offers the definition of "pay," which he says
means to give something in return for goods or services; if his statement is put into this
context, the real meaning would be that he never gave any money to anyone in return
for a fraudulent marriage.  The applicant then opines "this real meaning of the statement
could be true."

(g)  The applicant maintains, when case law is considered, it is immaterial
whether the applicant made a false statement about money.  The applicant cites a
Federal court case where the court ruled, although an immigration petitioner made false
statements, they were not material to the issue at hand; the only issue upon which the
petitioner's citizenship application turned was whether his marriage was "pretextual" (i.e.
having false reasons that hide true intentions).  The applicant contends, whether or not
he made false statements regarding payment was not material; the only issue was
whether the applicant intended to establish a life with his former spouse, and, as noted
earlier, the immateriality of the statement indicates the absence of an intent to deceive.

(h)  The applicant reiterates his argument about his USCIS case officer being
unreliable, and insists, had she told the applicant's unit commander that making a false
statement was immaterial to the determination of a fraudulent marriage, the unit
commander would not have included this allegation.  As a result, any fraudulent
marriage allegations made by his USCIS case officer should, in effect, be invalidated by
the Board.

(8)  USCIS behaved unreliably during the applicant's discharge case.

(a)  The applicant addresses apparent inconsistencies in what his USCIS case
officer reported to CID and then later told the battalion judge advocate.  He contends
the USCIS case officer was unaware the applicant had been issued an EAD.  The
applicant goes on to hold the USCIS case officer provided an unreasonable explanation
regarding the EAD, stating, in effect, the applicant was issued an EAD as part of his
marriage-based residency application; although the applicant's ex-wife withdrew her
petition and admitted to marriage fraud, the applicant's citizenship petition was never

ABCMR Record of Proceedings (cont)                                   AR20190010839

closed.  The USCIS case officer continued, saying, the applicant's files remained with ICE, pending the prosecution of the larger fraud ring; by the time ICE released the files, the applicant was already in the Army.  Given what the USCIS case officer said, the applicant claims:

- If USCIS could provide wrong information to the Army during the enlistment process, it could do the same during the investigation of his alleged fraudulent enlistment
- While the USCIS case officer stated the applicant's ex-wife admitted to marriage fraud, his ex-wife had no charges filed against her
- As a result of the relative-based immigration application, the applicant needed his ex-wife's petition for the applicant to immigrate; he could not have gotten an EAD all by himself; despite this, ICE did not later seek to deport him
- USCIS case officer stated the applicant's citizenship application was never closed, but her explanation was unreasonable; supposedly, his citizenship application remained open pending the criminal prosecution of the larger fraud ring
- Even with an open citizenship application, the government could have prosecuted him for violations of immigration law; neither ICE nor USCIS ever sought to file charges
- The marriage fraud conspirators pleaded guilty in April 2009 and the applicant enlisted in July 2009; USCIS inexplicably waited 2 years before informing CID of his possible fraudulent enlistment

(b)  The applicant states, he was not deported after his discharge; instead, USCIS scheduled him for a citizenship interview.  He provides quotes from Title 8, U.S. Code and the USCIS Policy Manual, and asserts USCIS found him to be a "person of good moral character."  He restates his argument regarding the USCIS case officer's unreliability, and he offers a "more reasonable story" regarding his immigration and naturalization process.  There is no argument the applicant stayed in the U.S. legally due to a student visa, and he married his ex-wife in 2007.  He states, "Maybe there were matchmakers, money, and immigration purpose involved.  But that is immaterial."  He describes the ubiquity of matchmakers in traditional Chinese culture and that "Matchmakers promote marriages and (have gotten) paid legally in China for thousands of years."  He reasserts how he truly intended to establish a life with his ex-wife, and that his ex-wife's withdrawal of support for his petition was invalid.  The applicant opines, when his former spouse signed the withdrawal form, she was on drugs and her mental status was "not normal"; in addition, she "admitted to the fraud marriage under the influence of drugs, and the ICE agent noticed this situation."

(c)  An ICE agent went to the applicant's apartment and spoke with several individuals, including the applicant and his ex-wife.  Apparently, following this visit, the ICE agent was "not reasonably assured" the applicant "never intended to live together"

11

ABCMR Record of Proceedings (cont)                                    AR20190010839

with his former spouse; the applicant argues, even if it were true that their intention to live together was not strong, that they broke up quickly, and that his ex-wife never really intended to establish a life with the applicant, the marriage would still be legal so long as the applicant had had that intent.  Because of the court's ruling in his case, the ICE agent took no action against the applicant; he maintains it is easy to see why USCIS did not act, and why he was eventually naturalized:  the Director, USCIS determined the applicant complied with all provisions of U.S. immigration law.

(9)  The Army lacked convincing evidence to support his separation.  The applicant lists 6 items of evidence (used by the ADRB in its two considerations of his case) and then discusses each item one-by-one.  He asserts the pieces of evidence cannot disprove his intent to establish a life together with his former spouse; fail to show he paid money for a fraudulent marriage; and do not affirm he made false statements about paying money with the intent to deceive.  The evidence also cannot prove he did not meet citizenship requirements when he enlisted in 2009.  His discussion of the evidence largely mirrors his above-stated arguments, in that he reiterates assertions of about jurisdiction, the absence of personal knowledge of his motives, and an inability to prove false official statement and fraudulent marriage.  He offers additional arguments that pertain to the following documents:

(a)  Battalion judge advocate's undated Memorandum for Record (MFR), Subject: [applicant] Incident of Fraudulent Entry; Executive Summary of Evidence, with associated timeline.

- The battalion judge advocate writes the applicant was never prosecuted and, according to USCIS, this was because the Department of Justice did not want to use its resources to go after a "little fish"
- The applicant opines the foregoing explanation is unreasonable and appears to be inconsistent with the USCIS case officer's statement that the applicant was no longer a legal alien once his ex-wife withdrew her petition
- The applicant contends, ICE could have deported him, or revoked his EAD, which would have hampered his efforts to find work and possibly cause  him to return to China on his own
- None of these things happened and, the applicant speculates, it is more probable than not that there was another reason why he was not charged (he does not state what this other reason might be)
- While the timeline may be the reason for suspecting the purpose of the applicant's marriage, it does not offer a basis for the separation action; the timeline does not prove it was more probable than not that the applicant did not intend to establish a life with his ex-wife

(b)  In CID's interview, the applicant denied knowing Mi__ W__ (listed on the Standard Form (SF) 86 (Questionnaire for National Security Positions) as the

ABCMR Record of Proceedings (cont)                                    AR20190010839

applicant's father-in-law); regarding the persons listed on the SF 86 as father-in-law and mother-in-law, the applicant said, "I swear to God that I didn't put Mi__ W__ or Me__ W__ on the SF 86." This was proof the applicant had denied intentionally adding wrong information to his SF 86.

(c) Applicant's PAI/PEI Report (Security Clearance Application), dated 28 July 2009. The report shows the applicant's in-laws as having Chinese names, with addresses in China. The applicant asserts the wrong information was inadvertently entered by him and his recruiter; the applicant acknowledges not reviewing the document before signing and that he "did not make this mistake 'with the intent to deceive.'"

(d) ICE interview of applicant's ex-wife on 17 June 2008. The applicant argues his ex-wife and her friends were all drug abusers and had mental problems; this made their statements unreliable because they had difficulty perceiving reality. In addition, they all had memory and judgment issues. None were immigration experts and likely did not understand the legal definition of a fraudulent marriage. The applicant also quotes portions of his ex-wife's statement to ICE and essentially discounts what she says due to her drug use and mental condition.

(e) "Marriages Connected to T__ and N__." This refers to a redacted extract from an ICE investigation into the marriage fraud ring run by Ms. K__ T__ and Mr. H__ N__; both pleaded guilty and were convicted by a Federal Court in 2009. The applicant notes, while much of the report is redacted, it indicates that, on a date in 2007, the Alameda County Clerk's office reported Mr. H__ N__ came to the clerk's office with a couple who were then married. ICE requested all marriage certificates executed on that date; one of the marriage certificates turned over by the clerk was the applicant's. The applicant claims it is more probable than not that the county clerk was referring to someone else, not the applicant; nonetheless, the ICE agent somehow mistook applicant's marriage as being the one associated with Mr. H__ N__.

(f) Ms. K__ T__ and Mr. H__ N__ Plea Agreements. The applicant contends, while these agreements show both Ms. K__ T__ and Mr. H__ N__ were guilty of arranging fraudulent marriages, they do not prove the applicant's guilt; nor do they serve to validate that Ms. K__ T__ and Mr. H__ N__ played a role in arranging the applicant's marriage. Additionally, the documents do not preclude the possibility that some of the allegedly fraudulent marriages were genuine; even if Ms. K__ T__ and Mr. H__ N__ were involved in the applicant's marriage, it cannot be proven the applicant did not intend to establish a life with his ex-wife, or that he paid them money and then made false statements with the intent to deceive.

ABCMR Record of Proceedings (cont)                              AR20190010839

d.  Under the heading "Justice," the applicant maintains his discharge was inconsistent with the disciplinary standards that were in effect at the time, and he cites the version of AR 635-200 that was then in effect.

(1)  He essentially argues the separation authority did not correctly apply the two tests described in paragraph 7-17; the Soldier described in the second test was convicted of a lesser, but not the disqualifying crime; in contrast, the applicant was not of convicted any crime.  The applicant contends, to be fair, he should have been treated better than the Soldier in the example.  He asked the separation authority to let him remain on active duty until his citizenship was determined, but his request was denied; if he had obtained his U.S. citizenship during the discharge process, he contends it is more likely than not that he would gotten a different type of discharge.

(2)  After the applicant told the ADRB he had not been charged with violating immigration law and had become a U.S. citizen, the ADRB stated the applicant's record gave no indication his command's actions were arbitrary or capricious.  The applicant asserts the ADRB's decisions in his case were arbitrary and capricious, because his situation was so similar to that of the Soldier in paragraph 7-17's second test.  He quotes two court decisions that state, if an agency treats similarly situated parties differently, its actions are arbitrary and capricious; this violates the APA.  Because the ADRB's decisions in his case were not the final answer, he asks the Board to set aside the ADRB's determinations.

(3)  Based on case law, the decisions of the ABCMR receive the benefit of an "unusually deferential application of the (APA's) 'arbitrary or capricious' standard." However, while "military judgment requiring military expertise" (i.e. matters specifically requiring military expertise/judgment) should be viewed with unusual deference, case law also requires traditional APA standards to be applied in the "review of the Board's application of a procedural regulation governing its case adjudication process."  As such, it would be inappropriate to apply the "unusually deferential" standard of review in the applicant's case because he has raised "non-frivolous claims of plain legal error involving the Army's failure to comply with statutes, regulations, and mandatory procedures."  The applicant contends "the key issue is (whether) a civilian intended to establish a life together with his ex-wife at the time of their marriage, and there was no 'military judgment requiring military expertise' involved."

(4)  The applicant cites a 2011 U.S. District Court case that addressed the ABCMR's denial of relief in Docket Number AR20060014346, dated 26 July 2007.

(a)  The court noted its own previous finding that it is "axiomatic that '[a]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so'"; it also quoted case law that stated, "[I]f an agency treats similarly situated parties differently, its action is arbitrary and capricious in violation of the APA."

14

ABCMR Record of Proceedings (cont)                          AR20190010839

    (b)  The court found, when the ABCMR denied relief in AR20060014346, it failed to address why an earlier ABCMR case, where relief was granted, was not used as a precedent; (the court mistakenly listed the docket number as AR200309457, vice AR2003094057; the court subsequently remanded the case to the ABCMR).  The court did not accept the following three reasons for the ABCMR's denial of relief in AR20060014346:  "The ABCMR reviews each case individually and is presented before the Board based on its own merit and evidence," "There are no cases that set the standards on how the Board should always vote," and "The decision in ABCMR Docket Number AR2003094057 ... was not a unanimous decision to grant relief."

    (c)  In the event the Board uses the same or similar reasons to deny his requests, the applicant submits the following counter-arguments:

- Regarding the first reason:  while true that the applicant's case is not exactly the same as the example in paragraph 7-17's second test, he contends it is "virtually identical"
- "Fraudulent marriage" could replace "burglary," and "trespass" substituted with some minor, non-disqualifying offense; consider a hypothetical where the applicant was charged with fraudulent marriage, but the charge was reduced to something non-disqualifying; result:  he would not have been discharged
- The fact is, the applicant was not charged at all; this obviously makes his general discharge unfair and unjust
- As to the second reason:  the aforementioned example specifically illustrates how to establish whether a fraudulent enlistment has occurred; it should "set the standards on how the Board should always vote"
- The last reason indicates the vote was not unanimous; he argues, assuming the Board agrees his case is exactly the same as the above-referenced example case, the vote should be unanimous; nonetheless, the court points out "A split decision ... is no less valid than a unanimous one"

    (5)  The applicant states, in effect, he enlisted through the MAVNI program and gave his EAD to his recruiter; the applicant affirms he was not an expert in immigration matters.  Considering that his EAD was never revoked, he was not charged with fraudulent marriage, and USCIS subsequently considered him to be a person of good moral character and naturalized him, it appears he did nothing wrong.  Further, he never faced nonjudicial punishment or a court-martial at any point during his active duty service; he participated in Special Forces training and earned two Certificates of Appreciation.  Since his discharge, he has remained dedicated to the service of this country; he insists he is worthy of being extended every possible consideration.

ABCMR Record of Proceedings (cont)                    AR20190010839

3.  The applicant provides 16 exhibits:

a.  The exhibits include documents from his official military personnel file, separation packet, and his two ADRB considerations.  He also submits naturalization documents, and news articles pertaining to the results of previous ABCMR cases and how ICE is currently executing search warrants for illegal immigrants.  He provides letters of recommendation from two supervisors from his post-service employment; both describe him as an effective worker and an honest, dedicated employee.

b.  As addressed in his foregoing argument, he also provides four affidavits previously submitted to the ADRB.  The affidavits were intended to validate his desire to establish a life together with his ex-wife, but the ADRB dismissed them as uncompelling.  The applicant resubmits them because, given the amount of time that has passed, he finds it is difficult, if not impossible to procure any new evidence that might further demonstrate the applicant's intent when he married.  The four affidavits, dated in July/August 2008, stated the following, in summary:

- Applicant's landlord (1st statement) – Ms. B__ R__ Wa__ certified she had personal knowledge of the applicant's "bona fide marriage relationship"; this was because, in December 2007, they leased an apartment from her and moved in; the landlord observed them doing household chores together
- Applicant's landlord (2nd statement) – Ms. B__ R__ Wa__ certified, on several occasions, the applicant's wife created disturbances; once, at 1 a.m., the applicant's wife banged the apartment building's gate, shouted loudly, and argued profanely with a taxi driver; neighbors were disturbed
- Ms. T__ M. L__'s doctor; friend of both the applicant and his ex-wife – the doctor certified he had personal knowledge of the "bona fide marriage relationship"; they and the doctor's family occasionally socialized; they sometimes slept at this place; applicant discussed marriage problems
- Mr. Ed__ Pl__ (friend of applicant and ex-wife; introduced applicant to his ex-wife; apparent link between the applicant and the marriage fraud ring) – certified personal knowledge of "bona fide marriage"; helped applicant in the dating process and saw instances of intimacy (i.e. kissing and hugging)

4.  The applicant's service records show:

a.  On 21 November 2002, the applicant entered the U.S. from China using an F-1 student visa; he attended school in Arizona.

(1)  He graduated in 2007 and extended his student visa under the Optional Practical Training program; his F-1 visa's adjusted expiration was 31 January 2008. (OPT is a USCIS initiative that allows F-1 student visa holders to obtain temporary employment in their major field of study for up to 12 months).

ABCMR Record of Proceedings (cont)                          AR20190010839

(2)  In or around February 2007, he moved to the San Francisco, CA vicinity.

(a)  On 23 October 2007, he married Ms. T__ M. L__ at an Oakland, CA county clerk's office.  On or around that same date, the county clerk's office contacted ICE to report that Mr. H__ N__ (subsequently convicted of conspiracy to commit marriage fraud) had come there with a couple who were then married.

(b)  The county sheriff told ICE that Mr. H__ N__ was also seen dropping off a second couple at the county clerk's office (believed by ICE to be the applicant and his now former spouse).  ICE obtained all of the marriage certificates completed on or around 26 October 2007 and found two that had the same witness; one of those certificates was the applicant's.

(3)  On 23 January 2008 (8 days prior to the expiration of the applicant's F-1/OPT visa), the applicant's spouse (hereinafter referred to as Ms. T__ M. L__) filed a USCIS I-130 (Petition for Alien Relative), reflecting the applicant as her spouse.  (The I-130 is a first step in helping an eligible relative immigrate to the U.S.; once approved the relative can apply for legal permanent residency).

b.  On 17 June 2008, ICE agents executed search and arrest warrants; the warrants were based on allegations Ms. T__ M. L__ was involved in a fraudulent marriage, arranged by Ms. K__ T__ (subsequently convicted of conspiracy to commit marriage fraud).

(1)  On ICE's arrival at the applicant's Daly City, CA residence, the applicant's landlord (Ms. B__ R__ Wa__) told ICE the applicant had been residing there for 3 months, but Ms. T__ M. L__ never lived there.

(2)  The landlord affirmed she had seen Ms. T__ M. L__ 3 days prior, when she came to speak with the applicant; Ms. B__ R__ Wa__ stated she had never seen them living together and did not know where Ms. T__ M. L__ resided.

c.  Also on 17 June 2008, ICE agents interviewed the applicant.

(1)  He stated his wife was staying at a local motel with her mother, after her mother's recent arrival from out-of-state for a visit.  He acknowledged his wife had been living on the streets and was staying with friends.

(2)  The applicant told ICE he met Ms. T__ M. L__ in August or September 2007 at a jewelry store; her friend, Mr. Ed__ Pl__, was with her at the time.  He saw her about 8 times after that, but never spent the night at any of the places she was staying. He asked Ms. T__ M. L__ to marry him while they were in his car, and, in December

17

ABCMR Record of Proceedings (cont)                          AR20190010839

2007 (sic, 23 October 2007), they were wed at a courthouse in Oakland.  They lived together for a short while at his Daly City address, but she moved out; Ms. T__ M. L__ had lifestyle problems and all they did was argue.

(3)  Prior to the marriage, he had not met any of Ms. T__ M. L__'s family; because his entire family was in China, Ms. T__ M. L__ had not met the applicant's family.

(4)  The ICE agents showed the applicant a photo line-up of four individuals; the applicant recognized only Mr. H__ N__, stating he had met Mr. H__ N__ at a local hotel, but he knew nothing about him.

(5)  The applicant said he later learned Ms. T__ M. L__ was a drug abuser and that she was hanging around bad people; they discussed getting an annulment or a divorce, but he wanted them to stay together.  He said he had tried to help Ms. T__ M. L__ by purchasing tickets for them to fly her back to her mother, but Ms. T__ M. L__ never showed up for the flight.  He denied being involved in a fraudulent marriage.  ICE agents then checked the applicant's closet and found 15 to 20 items of women's clothing, ranging in size from x-small to large; there were no shoes and some of the clothing items still had store tags on them.  The ICE report of investigation does not indicate whether ICE detained the applicant at the time.

d.  On 17 June 2008, ICE interviewed Ms. T__ M. L__ at the local motel; she was there with her mother and a friend, Mr. S__ C__.  While waiting for another ICE agent to arrive, the interviewing officer heard Ms. T__ M. L__ talking on the phone; she was heard saying:  "whatever you have me set up in, come get me"; "whatever thing you got me involved in; tell him to give me my $17,000"; and "tell him to empty his bank account and call it even."  Ms. T__ M. L__ later told the ICE agent she was talking to Mr. Ed__ Pl__ (the friend the applicant identified as being with Ms. T__ M. L__ when they met at the jewelry store).

(1)  Ms. T__ M. L__ claimed she met the applicant in a San Francisco restaurant in September 2007; she did not recall the name of the restaurant, but she remembered she was there alone, and the applicant was there with an unidentified girl.  They just started talking, exchanged phone numbers, and she would call the applicant.

(2)  Ms. T__ M. L__ said she and the applicant saw each other about 8 more times before the applicant began talking about getting married; he also mentioned getting a green card (USCIS Form I-551 (Permanent Resident Card)).  They agreed they could help each other; she would marry him so he could stay in the U.S., and she would be taken care of with some money.  Ms. T__ M. L__ did not remember who brought up the marriage fraud scheme, but the applicant now owed her money, as a

18

ABCMR Record of Proceedings (cont)                                AR20190010839

result of the marriage. She said the applicant had already given her a couple of cell phones and $4,000 in cash.

(3) Ms. T__ M. L__ continued, saying they got married in December 2007 (sic, 23 October 2007) at a courthouse in Oakland, and she lived with the applicant for a little while. She learned how to do marriage fraud from her friend, Mr. Ed__ Pl__ and Jo__ (an alias for Ms. K__ T__). She acknowledged not living at the applicant's Daly City residence, but had stayed there "a couple of times."

(4) Ms. T__ M. L__'s friend, Mr. S__ C__, offered additional information. He stated he had witnessed arguments about money between the applicant and Ms. T__ M. L__; the applicant would say he gave the money to Jo__ (AKA Ms. K__ T__). Mr. S__ C__ also heard Mr. E__ P__ tell Ms. T__ M. L__ she needed to meet with Jo__, and that he was sorry for getting her involved in the fake marriage to the applicant.

e. On 7 April 2009, Mr. H__ N__ signed a plea agreement in which he agreed to plead guilty to conspiracy to commit marriage fraud; apart from Ms. K__ T__ and one other named co-conspirator, the remaining co-conspirators were identified only as "U.S. Citizen-(number)" and "Chinese Citizen (number)." On 29 April 2009, Ms. K__ T__ also agreed to plead guilty to conspiracy to commit marriage fraud.

f. On 30 June 2009, the U.S. Army Recruiting Command sent USCIS a Form G-845 (Document Verification Request) to validate the applicant's immigration status; on 8 July 2009, USCIS responded, indicating the applicant's EAD appeared to be valid, and that it was due to expire on 16 May 2010; the applicant was pending an adjustment in status. In the comments section of the form, USCIS stated, "After a systems research, USCIS was unable to confirm that the applicant has maintained a continuous legal status for the previous two year period."

g. On 28 July 2009, as part of his enlistment into the Regular Army, the applicant completed the following forms:

(1) DD Form 1966 (Record of Military Processing – Armed Forces of the United States). The form showed: applicant was an immigrant alien; he had a dependent; and, to verify the applicant's name, age, and citizenship, the recruiter used a USCIS Form G-845.

(2) SF 86 (Questionnaire for National Security Positions)/PAI/PEI Report. On this form the applicant indicated: he was a nonimmigrant foreign national; he was married and his spouse was T__ M. (spouse's last name same as applicant's); his father-in-law was W__, Mi__, his mother-in-law was W__, Me__, and both lived in China.

19

ABCMR Record of Proceedings (cont)                              AR20190010839

h.  On 28 July 2009, he enlisted into the U.S. Army Reserve Delayed Entry Program (USAR DEP); on 16 September 2009, the applicant was discharged from the DEP and enlisted into the Regular Army for a 4-year and 25-week term.  His DA Form 3286 (Statement for Enlistment – U.S. Army Enlistment Program) shows:

(1)  He enlisted under the U.S. Army Training Enlistment Program (MAVN).  He acknowledged his enlistment was executed under a provision of Federal law that authorized the Secretary of the Army to access non-U.S. citizens into the Regular Army.

(2)  In exchange for enlisting, he agreed to apply for U.S. citizenship as soon as the Army certified his honorable service; if he became a U.S. citizen because of his military service, the government could revoke that citizenship in the event he were separated with a less than honorable conditions discharge.

i.  On 31 October 2011, while the applicant was assigned to a Group Support Battalion at Joint Base Lewis McChord (JBLM), WA, CID received a USCIS report indicating the applicant may have fraudulently enlisted.  Between 2 and 8 November 2011, CID contacted agents from Customs and Border Patrol (CBP) and USCIS, who provided the following:

- The applicant entered the U.S. on a student visa; the rule was, if not attending school, a nonimmigrant would have to leave the U.S. within 60 days; when there was a pending petition to adjust immigration status, however, a nonimmigrant could not be deported
- The applicant arranged to remain in the U.S. through a fraudulent marriage to Ms. T__ M. L__, but when that began to fall apart, the applicant joined the Army under the MAVNI program
- USCIS confirmed the applicant and Ms. T__ M. L__ were part of a marriage fraud ring involving Ms. K__ T__ and Mr. H__ N__; while Ms. K__ T__ and Mr. H__ N__ were both prosecuted, no charges were brought against either the applicant or Ms. T__ M. L__
- On 17 June 2008, Ms. T__ M. L__ withdrew her application pertaining to the applicant's permanent residence; she had cooperated in USCIS's investigation into the marriage fraud ring

j.  On 13 December 2011, the CID interviewed the applicant, and he provided the following in a sworn statement:

(1)  He affirmed he was married to Ms. T__ M. L__ from October 2007 to December 2010; he met his former spouse at a jewelry store in San Francisco; the applicant noted "Ed__ Pl__ had friends there," and the owner of the jewelry store was Mr. Ed__ Pl__'s sister-in-law.



ABCMR Record of Proceedings (cont)                                    AR20190010839

(2)  The applicant confirmed he had already applied for a green card, based on his marriage to a U.S. citizen (Ms. T__ M. L__), but the application was still pending.

(3)  Because his former spouse was a drug user and had drug-induced mental problems, the applicant stated he could not live with her.  On 14 June 2008 (2 days before the ICE interviews of the applicant and his now-former spouse), Ms. T__ M. L__ disturbed one of their neighbors; she then asked the applicant to call the police, after which they went to the emergency room.  On 15 June 2008, the applicant and Ms. T__ M. L__ picked up her mother from the airport.  Although they had initially planned on staying at the applicant's apartment, Ms. T__ M. L__ and her mother ended up going to a local motel instead (the landlord had kicked them out).  On 16 June 2008, ICE agents came to the applicant's apartment and rudely questioned him; he was half-asleep and nervous during the interview.

(4)  The applicant stated he told the ICE agents he loved Ms. T__ M. L__ and she loved him; she wanted to stay with him and that was why they married.  After they married, Ms. T__ M. L__ supported his citizenship application; he was never told she withdrew her support on 17 June 2008.  The applicant also could not explain why Ms. T__ M. L__ told the ICE agents she had agreed to pay her $4,000 to get a green card.  He acknowledged giving her some money ($30 several times); he also provided clothes, soda, and two cellphones.  He denied ever agreeing to pay Ms. T__ M. L__ $4,000.

(5)  He admitted knowing Ms. K__ T__ because she was a friend of Mr. Ed__ Pl__, but the applicant claimed not to know Mr. H__ N__.  The applicant also acknowledged he got married at the Oakland courthouse because Mr. Ed__ Pl__ told him it would be easier there.  He stated he never paid Ms. K__ T__, Mr. H__ N__, or anyone to facilitate a fraudulent marriage.  He additionally declared he never entered the names of his in-laws as W__, Mi__ or W__, Me__ on the SF 86.  He enlisted under the MAVNI program because he wanted a stable job, sought to gain military experience, and he liked the U.S. and having U.S. citizenship.

k.  On 5 April 2012, a master sergeant (MSG) counseled the applicant, stating the command had received information the applicant may have fraudulently enlisted; as a result, the command was required to initiate separation action.  The MSG confirmed no decision had yet been made with regard to the proposed separation.  The applicant indicated he agreed with the counseling.

l.  On 18 April 2012, CID finalized its report of investigation; CID established probable cause for fraudulent enlistment, as a result of the applicant's fraudulent marriage, and false official statement, which was based on erroneous entries on the applicant's SF 86.  CID concluded the applicant committed the alleged offenses to avoid deportation.

ABCMR Record of Proceedings (cont)                                    AR20190010839

m.  In an undated MFR, the judge advocate for the applicant's battalion summarized the case against the applicant:

(1)  The MFR detailed the applicant's alleged involvement with a marriage fraud ring in San Francisco (run by Ms. K__ T__ and Mr. D__ N__ (sic, Mr. H__ N__)), and confirmed the applicant had married Ms. T__ M. L__. Ms. K__ T__ and Mr. H__ N__ were later convicted of multiple violations of Federal immigration law, and the applicant was never prosecuted; USCIS indicated the Department of Justice, in effect, did not want to invest resources into prosecuting the applicant, whom they considered a "little fish."

(2)  At the time the applicant entered the Army, he presented his EAD to his Army recruiter; the applicant was then accessed under the MAVNI program.  USCIS subsequently forwarded the applicant's case file to CID for action.  The applicant withdrew his marriage residency application on 5 December 2010, following his divorce, and then filed for U.S. citizenship using his membership in the MAVNI program as the basis.

(4)  The battalion judge advocate opined, when the applicant enlisted, he concealed the fact his conditional residence in the U.S. was not valid, because his visa was based on a fraudulent marriage.  Thereafter, the applicant lied to CID about his marriage.

n.  In an undated memorandum, the applicant's JBLM commander advised him of his intent to separate the applicant under paragraph 7-17, AR 635-200.

(1)  The reasons for this action were:

(a)  The applicant procured his enlistment through deliberate and material misrepresentation, omission, or concealment of information that, if known by the Army, might have resulted in rejection.  Specifically, that the applicant falsely represented he was legally residing in the U.S. based upon a valid visa, which, in turn, had resulted from a fraudulent marriage.  With this false representation, the applicant procured his enlistment into the Army as a SPC, and, thereafter at JBLM, received pay and allowances while serving as an enlisted Soldier.

(b)  On 13 December 2011, and with the intent to deceive, the applicant made a false official statement to CID by stating he never paid anyone money for his marriage to Ms. T__ M. L__.

(2)  On 9 May 2012, the applicant acknowledged receipt and affirmed his commander had informed him of the basis for the contemplated separation action.  He further stated he had been advised of his right to consult with counsel prior to submitting

ABCMR Record of Proceedings (cont)                          AR20190010839

his Election of Rights; unless an extension was granted, a failure to respond within 7 days would constitute a waiver of his rights.

(3)  The applicant's separation packet does not include his Election of Rights.

o.  In a second undated MFR, the battalion judge advocate stated:

(1)  Per paragraph 7-17, AR 635-200, the commander was required to determine whether the applicant's previously concealed information was, in fact, disqualifying for enlistment.  A Soldier who did not meet citizenship requirements had to be processed for separation; to be a member of the MAVNI program, the applicant needed to have a legal immigration status at enlistment.  The applicant concealed the fact that his conditional permanent residence was obtained via a fraudulent marriage; the applicant's actions made it appear he was a lawful immigrant alien.

(2)  The commander also had to verify the existence and truthfulness of the disqualifying information, as documented in USCIS and CID reports.  Once the fraudulent enlistment was verified, the commander was to suspend the applicant's pay and allowances, and the separation authority was to direct the applicant's discharge.

p.  On 14 June 2012, the applicant's Group commander (also the separation authority) provided his determinations regarding the applicant's fraudulent entry in an MFR, Subject:  [applicant] Incident of Fraudulent Entry Determinations and Findings:

(1)  In accordance with chapter 7 (Defective Enlistments/Re-enlistments and Extensions), AR 635-200, the Group commander made the following determinations, based on USCIS and CID investigations:

(a)  That the applicant "concealed information that his conditional permanent residence in the United States at the time of enlistment was not valid because his temporary marriage visa was procured by a fraudulent marriage.  In order to effect the fraudulent marriage, [applicant] violated 18 U.S. Code, section 371 (Conspiracy to Commit Offense or to Defraud the United States); 8 U.S. Code, section 1325(c) (Immigration Marriage Fraud); and 18 U.S. Code, section 1546(a) (Using False Statement(s) to Obtain (a) Green Card)."

(b)  That the applicant "did not meet citizen requirements when he enlisted, and that this requirement was of a disqualifying nature.  In making this determination, (he) considered AR 601-2810 (sic, AR 601-210 (Active and Reserve Components Enlistment Program)), para 2-4 (Citizenship) and 4-22 (Nonwaivable Medical, Conduct, and Administrative Disqualifications), and (Title) 10 U.S. Code, section 504 (Persons not Qualified) and Memorandum, Deputy Chief of Staff, 28 January 2009, Subject:  MAVNI Pilot Program Implementation Policy."

ABCMR Record of Proceedings (cont)                               AR20190010839

    (c) That the applicant "enlisted through the MAVNI program on 28 Jul 09. The Army believed he was authorized to participate in the program because he falsely represented he was legally in the U.S. by possessing a temporary visa procured by a bona fide marriage to a U.S. citizen. The MAVNI program is only open to individuals who have had a valid immigration status for 2 years prior to enlistment. [Applicant]'s immigration status was not valid."

    (2) The Group commander affirmed he had verified the existence and truthfulness of the disqualifying information, as indicated by the investigative reports.

    q. On a date prior to 22 June 2012, the separation authority (applicant's Group commander) approved the unit commander's recommendation and directed the applicant's general discharge under honorable conditions. Orders, dated 22 June 2012, directed the applicant to report to the U.S. Army Transition Point on 29 June 2012.

    r. On 29 June 2012, the applicant was separated with a general discharge under honorable conditions; his DD Form 214 shows he completed 2 years, 9 months, and 14 days of his 4-year and 25 weeks enlistment contract. He was awarded or authorized the National Defense Service Medal and the Army Service Ribbon. His DD Form 214 also showed the following additional information:

- Item 25 (Separation Authority) – AR 635-200, chapter 7, section V (sic, section IV (Fraudulent Entry))
- Item 26 (Separation Code (SPD)) – JDA
- Item 27 (RE Code) – RE-3 (Waiver Required to Reenlist)
- Item 28 (Narrative Reason for Separation) – Fraudulent Entry

    s. On 29 June 2013, the applicant petitioned the ADRB, requesting an upgraded character of service and a change in the narrative reason for separation from fraudulent entry to reduction in force. He essentially argued his commanders thought he committed fraudulent enlistment because of an investigation; however, the result of that investigation ended up being favorable. On 26 March 2014, the ADRB conducted a records review and determined the applicant's discharge was proper and equitable.

    (1) The ADRB's Case Report and Directive listed the following documents obtained from the applicant's record:

- MFR, dated 14 June 2012, Subject: [applicant] Incident of Fraudulent Entry Determinations and Findings
- MFR, undated, Subject: [applicant] Incident of Fraudulent Entry; Executive Summary of Evidence, signed by the battalion judge advocate
- Negative counseling statement, dated 5 April 2012

ABCMR Record of Proceedings (cont)                                AR20190010839

- CID Report, dated 18 April 2012, which included seven relevant
  documents:  applicant's PAI/PEI Report, dated 28 July 2009; SF 312,
  dated 21 April 2010; USCIS Form N-400, dated 28 January 2010; two
  separate Forms G-325A (Biographic Information), dated 25 January 2008
  and 23 January 2008;
- (continued CID Report documents):  Form I-130, Petition for Alien
  Relative, dated 23 January 2008; County Superior Court divorce decree,
  dated 10 December 2010; and DHS report of investigation, dated 30
  June 2008
- Memorandum, dated 10 June 2009, Subject:  Assignment of Select
  Foreign Born Soldiers to Units of the USASOC
- Email correspondence, dated between May and June 2012, Subject:
  Follow/Up/[applicant]

   (2)  The ADRB found the applicant did not provide any independently
corroborating evidence showing his command's action was erroneous or that the
applicant's service mitigated his misconduct.

   (a)  As to the applicant's insistence his marriage was not fraudulent, this
assertion was contradicted by the evidence of record; moreover, barring substantial and
credible evidence to the contrary, there was a presumption of regularity in the conduct
of governmental affairs.  The applicant bore the burden of overcoming this presumption,
but the evidence he offered was insufficient.

   (b)  Regarding the applicant's request to change the narrative reason for
separation, the applicant's DD Form 214 correctly stated why he was separated.

   (c)  The applicant insisted he had good service and submitted certificates of
appreciation, but the ADRB determined the applicant's evidence did not mitigate the
reason for his separation.  The applicant further advised the ADRB he had been granted
U.S. citizenship after his discharge; the ADRB stated a review of the applicant's overall
service record, along with the reasons for his separation, led the ADRB to conclude his
subsequent naturalization was not enough overcome his fraudulent enlistment.

   (d)  The ADRB addressed the four notarized affidavits, dated in July and August
2008, presented as evidence by the applicant; although the writers claimed personal
knowledge of the applicant's marital relationship, the statements appeared to have been
generated as part of an investigation that pre-dated the applicant's enlistment, and the
ADRB did not find them compelling enough to overcome the presumption of regularity.

   (e)  The ADRB stated the applicant's record did not contain any indication or
evidence of arbitrary or capricious actions by the applicant's command, and all
requirements of law and regulation were met.

ABCMR Record of Proceedings (cont)                    AR20190010839

t. On 1 August 2016, the applicant filed a second petition with the ADRB, requesting a personal appearance with counsel to obtain a upgraded discharge, amended narrative reason for separation, and a revised reentry eligibility code. Through counsel, the applicant claimed the investigation into his fraudulent entry was incomplete and was based on an assumption he knowingly and intentionally procured his enlistment through fraud. Rather than waiting for the finalization of the investigation, the applicant's chain of command unjustly separated him; the applicant contended, in effect, USCIS cleared him of wrongdoing and granted him U.S. citizenship. On 8 May 2017, the applicant personally appeared before the ADRB; the ADRB unanimously voted to deny the applicant's requests. The ADRB referred to the same documentary evidence previously obtained from the applicant's service record and used in its earlier review of the applicant's case (AR20130012817).

(1) The ADRB considered the applicant's testimony, his entire service record, the reasons for discharge, and his post-service accomplishments; it did not find enough evidence to overcome the reasons for separation and characterization of service.

(2) In addition, the ADRB stated the applicant's record did not contain any indication or evidence of arbitrary or capricious actions by the applicant's leadership. The applicant's discharge was consistent with the procedural and substantive requirements of the regulation, was within the discretion of the separation authority, and the applicant received full administrative due process.

5. According to the version of AR 601-210 (Active and Reserve Components Enlistment Program) effective when the applicant enlisted, only legal aliens who had been admitted into the U.S. for permanent residence were authorized to enlist.

a. In November 2008, the Secretary of Defense approved the MAVNI program, which provided for an exception to the regulation's citizenship requirements. One purpose of the program was to recruit legal nonimmigrant aliens with expertise in specific languages; Chinese was one of those languages.

b, In February 2009, the U.S. Army Recruiting Command implemented MAVNI as a pilot program. MAVNI eligibility requirements included:

- Status as an asylee, refugee, or Temporary Protected Status, or having in one of 19 nonimmigrant categories (a nonimmigrant is a foreign national who enters the U.S. on a temporary basis for tourism, business, or to study); nonimmigrants with "F" (student) visas were eligible for this program
- Being in one of the above-mentioned statuses for at least 2 years immediately prior to enlistment
- No single absence from the U.S. of more than 90 days during the last 2 years before enlisting

26

ABCMR Record of Proceedings (cont)                        AR20190010839

6. During the applicant's era of service, commanders were required to initiate separation action against Soldiers who had fraudulently enlisted into the Army.

   a. AR 635-200, in effect at the time, defined fraudulent entry as the procurement of an enlistment through any deliberate material misrepresentation, omission, or concealment of information which, if known and considered by the Army at the time of enlistment or re-enlistment, might have resulted in rejection.

   b. Section IV of Chapter 7, AR 635-200, specified two tests, which commanders had to apply in order to determine whether separation was appropriate; any incident that met the below-listed two tests could be the basis for a fraudulent entry separation.

      (1) First Test – determine if previously concealed information is, in fact, disqualifying, applying the criteria outlined in AR 601-210. Any waivable or non-waivable disqualification concealed, omitted, or misrepresented was fraudulent entry.

      (2) Second Test – verify the existence and true nature of the apparently disqualifying information; if a Soldier alleged he/she was convicted of burglary and placed on probation, inquiries had to be made as to whether the Soldier was actually convicted of burglary. In fact, the Soldier may have initially been charged with burglary, but the charge was later reduced to a non-disqualifying minor non-traffic offense.

   c. When court-martial charges were not pending or contemplated, commanders could separate the Soldier for fraudulent entry using the notification procedure, so long as the circumstances did not warrant an under other than honorable conditions discharge.

   d. The notification procedure instructed commanders to give the Soldier a written notice of the proposed separation, the type of separation, the reason for the commander's action, and the Soldier's rights under the regulation; those rights included: consultation with military counsel, submission of statements in his/her own behalf, copies of documents to be sent to the separation authority, and the ability to waive the aforementioned rights in writing. On a document titled, Election of Rights, the Soldier was to indicate whether he/she had consulted with counsel, was submitting matters in his/her own behalf, and what rights he/she was asserting or waiving. The notification procedure did not include the right to present his/her case before an administrative separation board; in addition, Soldiers whose combined active duty and Reserve Component service totaled was less than 6 years were not entitled to an administrative separation board.

7. The "Due Process Clause" appears in both the 5th and 14 amendments of the U.S. Constitution, and it essentially prohibits the government from depriving a person's life, liberty, or property without giving him/her notice, providing him/her the opportunity to be

ABCMR Record of Proceedings (cont)                          AR20190010839

heard, and permitting the final result to be determined by a neutral decision-maker. The 5th amendment addresses two aspects of due process: procedural, concerned with how legal proceedings are conducted, and substantive, dealing with the content of law as they are applied in legal proceedings. The 14th amendment states, "...nor shall any State deprive any person of life, liberty, or property, without due process of law."

8. AR 635-200 states secretarial plenary separation authority is the prerogative of the Secretary of the Army; as such, it should be used sparingly and exercised only when, on a case-by-case basis, no other provision of the separation regulation applies.

9. AR 635-5 (Separation Documents), then in effect, stated entries in items 26 and 28 of the DD Form 214 were based on separation authority; according to AR 635-5-1 (SPD), when the separation authority was based on chapter 7, AR 635-200, fraudulent entry, "JDA" was the correct SPD, and "Fraudulent Entry" was the associated narrative reason for separation. The source for item 27 is AR 601-210, and the SPD/RE Code Cross Reference Table was used to find the appropriate RE code, based on the SPD; the SPD "JDA" had a corresponding RE code of "3."

10. The Administrative Procedure Act (APA) was enacted by Congress in 1946 and governs the operation of administrative agencies within the Federal government. The Act's purposes are to ensure agencies keep the public informed and offer opportunities for public participation in the rule-making process, prescribe uniform standards for the conduct of formal rule-making and adjudicatory proceedings, and the APA restates the law of judicial review. The APA further grants U.S. Federal Courts oversight authority of Federal agencies.

    a. Section 558 (Imposition of Sanctions; Determination of Applications for Licenses; Suspension, Revocation, and Expiration of Licenses), addresses the exercise of power or authority by government agencies; it states, "a sanction may not be imposed or substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law."

    b. Chapter 7 (Judicial Review). A person is entitled to a judicial review (i.e. a reconsideration by a Federal court) when an agency's actions have caused him/her to incur a legal wrong. The reviewing court decides relevant questions of law, interprets constitutional and statutory provisions, and determines the meaning or applicability of the terms of an agency's action. Actions by the reviewing court can include setting aside an agency's actions, findings, and conclusions when the court finds the agency abused its discretion, acted in a manner that was arbitrary and capricious, or otherwise failed to comply with the law.

ABCMR Record of Proceedings (cont)                                          AR20190010839

11.  U.S. Court of Appeals case, Bark v. Immigration and Naturalization Service (INS),
was decided in 1975; the petitioner had been denied an immigration status adjustment
from student to permanent resident because INS claimed the petitioner's marriage was
a sham (i.e. fraudulent).  The court found INS based its determination solely the fact the
petitioner and his wife had separated; the court stated a marriage can be considered a
sham if the bride and groom did not intend to establish a life together at the time they
married.  The conduct of the petitioner and his wife after marriage only mattered if
reflected the couple's subjective state of mind at the time of the marriage, and evidence
of separation, by itself, was not enough to substantiate the marriage was not bona fide.

12.  Harvard Law Review, Volume 99 (April 1986) included an article entitled, The
Constitutionality of the INS Sham Marriage Investigation Policy.  The article essentially
argued the manner in which was INS investigating marriages between nonimmigrant
aliens and U.S. citizens/permanent residents was intrusive; the article contended either
courts or the U.S. Congress should implement procedural safeguards to ensure privacy
rights were balanced with legal requirements. In its description of sham marriages, the
article posited the sham marriage could either be contractual (both parties agree to
marry solely for immigration purposes) or unilateral (where the nonimmigrant alien
deceives the unsuspecting U.S. citizen/permanent resident into marrying).

BOARD DISCUSSION:

1.  The Board carefully considered the applicant's request, supporting documents,
evidence in the records, regulatory and legal requirements, and published DoD
guidance for consideration of discharge upgrade requests.  The Board noted the facts
presented above.  The Board noted that the applicant's discharge for fraudulent entry
had a number of command and legal reviews as cited in paragraph 4m through 4p
above.  The Board noted that the CID investigation established probable cause for
fraudulent enlistment, as a result of the applicant's fraudulent marriage, and false official
statement, which was based on erroneous entries on the applicant's SF 86.  CID
concluded the applicant committed the alleged offenses to avoid deportation.  The
Board noted that the USCIS investigation found that the applicant did not meet the
residency requirement for remaining in the US after his student visa ended, was unable
to confirm that the applicant has maintained a continuous legal status for the previous
two year period prior to enlisting for MAVNI, that he entered in a fraudulent marriage to
remain in the US, and when that began to fall apart, the applicant joined the Army under
the MAVNI program by providing false statements.

2.  The Board considered each of the applicant's contentions that his discharge for
fraudulent entry was unjust and the result of numerous errors committed against him by
the Army and the ADRB.  The applicant offers 9 arguments in support of his claims
which are discussed in subparagraphs a through f below:

ABCMR Record of Proceedings (cont)                          AR20190010839

   a.  The Army lacked jurisdiction to determine whether his marriage was fraudulent.

     (1)  The term "jurisdiction" applies to the exercise of legal/judicial authority; separations under AR 635-200 are administrative in nature, and its authority is based on applicability rather than jurisdiction.  AR 635-200 is a regulation that is applicable to all active duty enlisted Soldiers, and, at the time of his separation, section III (Separation Authority) the regulation's chapter 1 (Purpose) gave the applicant's Group commander the authority to approve the applicant's separation action.

     (2)  An administrative inquiry, such as one conducted under chapter 7, AR 635-200, was not bound by judicial standards; such an inquiry was not intended to determine guilt or innocence, and neither judicial rules of evidence nor beyond-a-reasonable-doubt standards of proof applied.  The regulation limited the separation authority's inquiry to an administrative determination of whether there was potentially disqualifying information and if the applicant misrepresented, omitted, or concealed it.  In conducting this inquiry, the separation authority was empowered to use all available evidence (to include hearsay), and to employ a preponderance of evidence standard of proof (i.e. where the weight of the evidence presented is greater than 50-50).

     (3)  The applicant's assertion as the Army's lack of authority hinges on the fact his allegedly fraudulent marriage occurred before he entered the Army; however, all fraudulent entry determinations necessarily involve potentially disqualifying events that took place before an enlistment.

   b.  The applicant asserts his circumstances mirror the regulatory example cited in the second test in paragraph 7-17.  He argues case law and the APA require the ABCMR to consistently decide similar cases or provide distinguishing reasons why it determined one applicant's request was different from another.  Additionally, the ADRB did not follow AR 635-200, in that it did not ensure the proper application of the second test in paragraph 7-17, AR 635-200, and failed to conduct an inquiry, which would show the applicant was not convicted of fraudulent marriage.

     (1)  The Soldier in the second test example disclosed he might have been convicted of a disqualifying crime; a commander's inquiry found the Soldier was convicted of a lesser, non-disqualifying offense instead.  The evidence of record and the applicant's statements do not affirm the applicant ever told the Army he was previously under DHS/DOJ scrutiny for possible immigration law violations, or that his then-spouse had admitted to committing marriage fraud when she and the applicant wed.  At the time of his enlistment, paragraph 4-2 (Moral and Administrative Disqualifications), AR 601-210, required recruiters to conduct a suitability determination when there was an indication a potential enlistee had a criminal history; this determination was mandated regardless of disposition, even for cases where the enlistee was released

ABCMR Record of Proceedings (cont)                          AR20190010839

without prosecution. The evidence of record does not reflect the applicant underwent a suitability review prior to enlisting.

(2) The applicant argues, contrary to the second test example where the Soldier was convicted, DHS/DOJ never filed charges against him for marriage fraud, and, because the 5-year statute of limitations lapsed in October 2012, they never will. The applicant additionally provides evidence that, in 2013, USCIS approved him for U.S. citizenship. USCIS's action followed the applicant's citizenship request, which he submitted while on active duty, and for which the basis was his military service; in addition, it came after the applicant's lawsuit against USCIS was settle in his favor. On 23 May 2013, he was naturalized as a U.S. citizen.

(a) The final CID report of investigation stated CID and USCIS had sufficient evidence to establish probable cause the applicant had committed fraudulent entry when he fraudulently married Ms. T__ M. L__ to avoid deportation.

(b) The battalion judge advocate's memorandum, Subject: [applicant] Incident of Fraudulent Entry; Executive Summary of Evidence, stated USCIS "indicate(d) that the DOJ did not want to utilize resources to go after a 'little fish.'"

c. The applicant contends, while his unit commander used an allegation of false official statement as one reason for separation action, the separation authority did not address it.

(1) Despite the applicant's unit commander's reference to a false official statement, the separation notification only cited the regulation's provision for fraudulent entry (paragraph 7-17).

(2) The rendering a false official statement with the intent to deceive is serious misconduct and violates Article 107 (False Official Statements), Uniform Code of Military Justice (UCMJ). Because the UCMJ's maximum punishment for this offense includes a punitive discharge, the commander could have used it as a basis for a misconduct separation under paragraph 14-12c (Commission of a Serious Offense), AR 635-200; the commander did not include this provision to support his discharge recommendation.

d. The applicant contends he met citizen requirements when he enlisted; the Army cannot prove its reasons and findings and lacked convincing evidence to support his separation.

(1) In his determination memorandum, dated 14 June 2012, the separation authority states, "[applicant] did not meet citizen requirements when he enlisted, and that this requirement (was) of a disqualifying nature for enlistment." In reaching this

31

ABCMR Record of Proceedings (cont)                                    AR20190010839

finding, the separation authority would have applied the preponderance of evidence
standard of proof; an underlying misconception in the applicant's argument is that the
evidence being considered by the separation authority had to be proved beyond a
reasonable doubt.

    (2)  The evidence of record reflects the following recapitulation of events that
would have been available for the separation authority's review:

- The applicant entered the U.S. in a nonimmigrant status using an
  F-1 (student) visa; his F-1 status was extended until 31 January 2008 due to
  the approval of OPT
- Around August/September 2007, the applicant met Ms. T__ M. L__; after
  meeting 8 times, they agreed to marry; the applicant has maintained he
  married for love; Ms. T__ M. L__ said they mutually agreed the applicant
  would pay her money in exchange for her help in securing a green card
- On 23 October 2007, the applicant and Ms. T__ M. L__ married at an
  Oakland county clerk's office; the country clerk alerted ICE about suspicious
  marriages involving a Mr. H__ N__; of the marriage certificates reviewed by
  ICE, two had the same witness, and one of those was the applicant's
- On 23 January 2008 (8 days before the applicant's OPT expired), Ms. T__ M.
  L__ filed a USCIS Form I-130 (Petition for Alien Relative); Ms. T__ M. L__
  listed an address in Daly City, CA as their joint residence
- On 17 June 2008, ICE agents executed search and arrest warrants because
  of allegations Ms. T__ M. L__ was involved in a fraudulent marriage arranged
  by Ms. K__ T__ (ultimately convicted with Mr. H__ N__ of conspiracy to
  commit marriage fraud); ICE agents went to the applicant's Daly City address
- The applicant's Daly City landlord, Ms. B__ R__ Wa__, told ICE the applicant
  had been living there for 3 months, but Ms. T__ M. L__ never resided there
- Ms. B__ R__ Wa__ later affirmed, in a 20 July 2008 affidavit, she had
  personal knowledge of the applicant's "bona fide marriage"; she stated the
  applicant and Ms. T__ M. L__ began living at her apartment building in
  December 2007; she saw them doing household chores together
- On 17 June 2008, ICE agents questioned the applicant; he told ICE, after
  they married, Ms. T__ M. L__ moved into their Daly City residence, but left
  shortly thereafter due to "lifestyle problems"; ICE checked the applicant's
  closet and found variously-sized women's clothing, some with store tags
- On 17 June 2008, ICE located Ms. T__ M. L__ at a motel; an ICE agent
  heard her talking on the phone to someone she later identified as Mr. E__
  P__ and saying, "Whatever you have me set up in, come get me... tell him to
  give me my $17,000... tell him to empty his bank account and call it even"
- Ms. T__ M. L__ then told ICE, after meeting with the applicant about 8 times,
  the applicant proposed getting married so he could get a green card; she

32

ABCMR Record of Proceedings (cont)                                    AR20190010839

confirmed the applicant still owed her money for the marriage; she said she
learned how to do marriage fraud from Mr. E__ P__ and Ms. K__ T__

- Ms. T__ M. L__'s friend, Mr. S__ C__, said he witnessed arguments about
money between the applicant and Ms. T__ M. L__; the applicant would say
he gave the money to Ms. K__ T__, he also heard Mr. E__ P__ say he was
sorry for getting Ms. T__ M. L__ involved in a fake marriage to the applicant
- In April 2009, Ms. K__ T__ and Mr. H__ N__ were convicted of conspiracy to
commit marriage fraud
- In or around June 2009, the applicant offered the recruiter his EAD as proof of
his valid immigration status; USCIS told the Army recruiter the EAD appeared
valid, but it expired in May 2010 and the applicant was pending a status
change
- On 28 July 2009, the applicant completed an SF 86, in which he stated he
was in a nonimmigrant status; he listed Ms. T__ M. L__ as his spouse and
provided the names and addresses of his in-laws (both were Chinese with
addresses in China)
- On 28 July 2009, he enlisted into the USAR DEP under the MAVNI program
- On 31 October 2011, CID received a USCIS report indicating the applicant
may have fraudulently enlisted
- Per subsequent conversations with USCIS and CBP agents, CID learned the
applicant would have been required to leave the U.S. because he was not
attending school and his OPT had expired; he could not be deported,
however, while his U.S. citizenship petition was pending

   e. The Army violated the applicant's due process rights by not allowing him to
present his case to either an administrative separation board and/or a court-martial. He
also asserts there was no proof the evidence he submitted was ever considered by the
separation authority.

   (1) By regulation, Soldiers with less than 6 years total active duty and Reserve
Component service were not entitled to present their case before an administrative
separation board. In addition, the regulation stipulated the commander's use of the
notification procedure when the circumstances did not warrant an under other than
honorable conditions character of service.

   (2) Among the rights available to Soldiers under the notification process were
the right to consult with military counsel and to submit statements in his/her own behalf.
After consulting with counsel, the regulation indicated the Soldier was to complete and
sign the Election of Rights, and submit any evidence he/she wanted the separation
authority to consider; this document, along with the Soldier's evidence, was to be
included in the Soldier's separation packet. In the applicant's case, the separation
packet is void of his Election of Rights document and the evidence he contends he
submitted.

ABCMR Record of Proceedings (cont)                              AR20190010839

    f.  The USCIS case officer gave improper instructions and USCIS behaved unreliably during the applicant's discharge case.  The applicant asserts USCIS bore the responsibility for providing a definition of marriage that included the intent "to establish a life together" with Ms. T___ M. L___ when they married.  He posits, a marriage could not be deemed fraudulent if at least one of the parties (in this case, the applicant) married with the intent to establish a life together, and this was true even when the "couple did not live together, and a matchmaker arranged this marriage for immigration purpose, and there was money was involved."

    (1)  The separation authority affirmed he evaluated evidence provided by CID and USCIS reports of investigation; he did not indicate he referred to information provided by the applicant's USCIS case officer.

    (2)  The evidence included in the CID and USCIS reports of investigation would have allowed the separation authority to determine whether, at the time of his marriage, the applicant intended to establish a life with Ms. T___ M. L___.  On 14 June 2012, the separation authority stated he found sufficient evidence to show the applicant's immigration status was invalid at the time of his enlistment, and this fact was disqualifying.

3.  As a result of this thorough review noted above, the Board found insufficient evidence of in-service mitigation to overcome the misconduct of fraudulent entry and found that the general under honorable conditions character of service equitable under the circumstances.  Based on a preponderance of evidence, the Board determined that there was no error or injustice in the applicant's reason and authority for discharge for fraudulent entry, separation code, RE code, and general under honorable conditions character of service.  The Board found that relief is not warranted.

ABCMR Record of Proceedings (cont)                          AR20190010839

BOARD VOTE:

| Mbr 1 | Mbr 2 | Mbr 3 | |
|-------|-------|-------|-------------------------|
| : | : | : | GRANT FULL RELIEF |
| : | : | : | GRANT PARTIAL RELIEF |
| : | : | : | GRANT FORMAL HEARING |
| :GLK | :JFT | :GLC | DENY APPLICATION |

BOARD DETERMINATION/RECOMMENDATION:

The evidence presented does not demonstrate the existence of a probable error or
injustice. Therefore, the Board determined the overall merits of this case are insufficient
as a basis for correction of the records of the individual concerned.

10/19/2020

 DR. GERRY L. KITZHABER

CHAIRPERSON
Signed by: KITZHABER.GERRY.LAWRENCE.1101228300

I certify that herein is recorded the true and complete record of the proceedings of the
Army Board for Correction of Military Records in this case.

REFERENCES:

1. Title 10, USC, section 1552(b), provides that applications for correction of military
records must be filed within 3 years after discovery of the alleged error or injustice. This
provision of law also allows the ABCMR to excuse an applicant's failure to timely file
within the 3-year statute of limitations if the ABCMR determines it would be in the
interest of justice to do so.

2. AR 635-200, in effect at the time, prescribed policies and procedures for enlisted
administrative separations; it was applicable to all Regular Army enlisted personnel.

ABCMR Record of Proceedings (cont)                    AR20190010839

   a. Section III (Separation Authority), Chapter 1 (General Provisions), stated commanders with special court-martial convening authority were authorized to approve or disapprove separation for chapter 7, unless an under other than honorable conditions discharge was warranted.

   b. Section I (Notification Procedure), Chapter 2 (Procedures for Separation) outlined the requirements of the notification procedure.

   (1) The notification procedure instructed commanders to give the Soldier a written notice of the proposed separation, which specified the type of separation, the reason for the commander's action, and the Soldier's rights under the regulation; those rights included: consultation with military counsel, submission of statements in his/her own behalf, copies of documents to be sent to the separation authority, and the ability to waive the aforementioned rights in writing.

   (2) On a document titled, Election of Rights, the Soldier was to indicate whether he/she consulted with counsel, was submitting matters in his/her own behalf, and what rights he/she was asserting or waiving. The notification procedure did not include the right to present his/her case before an administrative separation board; in addition, Soldiers whose combined active duty and Reserve Component service totaled was less than 6 years were also not entitled to an administrative separation board.

   c. Paragraph 3-7a (Honorable Discharge). An honorable discharge was a separation with honor and entitled the recipient to benefits provided by law. The honorable characterization was appropriate when the quality of the member's service generally met the standards of acceptable conduct and performance of duty for Army personnel or was otherwise so meritorious that any other characterization would be clearly inappropriate.

   d. Paragraph 5-3 (Secretarial Plenary Authority). Secretarial plenary separation authority is the prerogative of the Secretary of the Army; as such, it should be used sparingly and exercised only when, on a case-by-case basis, no other provision of the separation regulation applies..

   e. Section IV (Fraudulent Entry), Chapter 7, pertained to the procurement of an enlistment through any deliberate material misrepresentation, omission, or concealment of information. If the Army had known and considered this information at the time of enlistment, rejection might have resulted; this included all disqualifying information requiring a waiver. Commanders were to apply the following tests for each case of suspected fraudulent enlistment:

   (1) First Test – commanders were to determine if previously concealed information was, in fact, disqualifying; this information was to be evaluated using the

ABCMR Record of Proceedings (cont)                          AR20190010839

criteria for enlistment in AR 601-210 (Regular Army and Army Reserve Enlistment
Program). Any waivable or nonwaivable disqualification concealed, omitted, or
misrepresented constituted fraudulent entry. This included concealing information with
alleged or actual recruiter connivance. If, however, the newly revealed information did
not amount to a disqualification, then there was no fraudulent enlistment.

   (2) Second Test – commanders had to verify the existence and true nature of
the apparent disqualifying information. Verification of the actual offense might reveal no
disqualification, and thus not constitute fraudulent entry. For example, if the Soldier
alleged a conviction for burglary and placement on probation, commanders were to
inquire as to whether a court actually convicted him/her. Commanders could determine,
while the initial charge was burglary, civilian authority reduced the charge to trespass (a
minor, non-traffic offense for enlistment purposes).

   (3) Any incident that met the foregoing two tests could be cause for fraudulent
entry separation. An example of fraudulent entry was the concealment of the Soldier's
true citizenship status and concealment of other disqualifications.

   (4) Upon receipt of the unit commander's separation request, the separation
authority determined whether fraudulent entry was verified and proven. If verified, the
separation authority was to take action to suspend the Soldier's pay and allowances.
The separation authority also directed the Soldier's discharge and the issuance of an
honorable or under honorable (general discharge) character of service. In determining
the character of service, the separation authority was to assess the evidence of
preservice misrepresentation, which would have precluded, postponed, or otherwise
affected the Soldier's enlistment. In addition, because fraudulent enlistment was an
offense under the UCMJ (Article 83), and based upon acceptance of pay and
allowances, such improper acceptance of pay was as an "in-service" activity that
separation authorities could factor into the character of service determination.

3. AR 601-210, in effect in July 2009, prescribed policies and procedures of the
enlistment of Regular Army and U.S. Army Reserve enlistees/applicants.

   a. Chapter 2 (Enlistment in the Regular Army. Army Reserve, or Army National
Guard for Non-Prior Service Applicants) outlined enlistment considerations. Paragraph
2-2 (Basic Eligibility Criteria for All Non-Prior Service Applicants), listed citizenship as a
criteria:

   (1) An applicant was eligible if he/she was:
   • U.S. Citizen
   • Alien lawfully admitted into the U.S. for permanent residence
   • National of the U.S.

ABCMR Record of Proceedings (cont)                    AR20190010839

- Citizens (including naturalized citizens) of the Federated States of Micronesia, Palau, and the Republic of the Marshall Islands
- U.S. Citizen by adoption

(2) Permanent residents had to present their I-551 (Permanent Residence Card) as proof they had been admitted into the U.S. for permanent residence. The regulation does not list any other USCIS forms use as verification documents.

b. Table 3-1 (U.S. Army Reentry Eligibility Codes) showed RE codes; this table is extracted from the version of the regulation in effect in June 2012:

- "RE-1" applied to Soldiers completing their initial term of active service who were fully qualified when last separated
- "RE-3" applied to Soldiers who were not qualified for continued Army service, but the disqualification was waivable

4. In November 2008, the Secretary of Defense approved the MAVNI program in order to recruit legal aliens with expertise in specific languages; Chinese was one of those languages. In February 2009, the U.S. Army Recruiting Command implemented MAVNI as a pilot program. MAVNI eligibility requirements included:

- Status as an asylee, refugee, or Temporary Protected Status, or having in one of 19 nonimmigrant categories (a nonimmigrant is a foreign national who enters the U.S. on a temporary basis for tourism, business, or to study); nonimmigrants with "F" (student) visas were eligible for this program
- Being in one of the above-mentioned statuses for at least 2 years immediately prior to enlistment
- No single absence from the U.S. of more than 90 days during the last 2 years before enlisting

5. AR 635-5, in effect at the time, prescribed policies and procedures for the completion of the DD Form 214. The regulation stipulated the required entries for Items 26 (SPD) and 28 (Narrative Reason for Separation) were found in AR 635-5-1 (SPD Codes).

6. AR 635-5-1, in effect at the time, provided the specific authorities (regulatory or directive), reasons for separating Soldiers from active duty, and the SPD codes to be entered on the DD Form 214. It identified the SPD code of "JDA" as applying to Soldiers separated under the provisions of paragraph 7-17, AR 635-200; the associated narrative reason for separation was "Fraudulent Entry." Soldiers separated per paragraph 5-3 (Secretarial Plenary Authority) received the SPD of "JFF," with "Secretarial Authority" listed as the narrative reason for separation.

ABCMR Record of Proceedings (cont)                    AR20190010839

7. The "Due Process Clause" appears in both the 5th and 14 amendments of the U.S. Constitution, and it essentially prohibits the government from depriving a person's life, liberty, or property without giving him/her notice, providing him/her the opportunity to be heard, and permitting the final result to be determined by a neutral decision-maker. The 5th amendment addresses two aspects of due process: procedural, concerned with how legal proceedings are conducted, and substantive, dealing with the content of law as they are applied in legal proceedings. The 14th amendment states, "...nor shall any State deprive any person of life, liberty, or property, without due process of law."

8. The Administrative Procedure Act (APA) was enacted by Congress in 1946 and governs the operation of administrative agencies within the Federal government. The Act's purposes are to ensure agencies keep the public informed and offer opportunities for public participation in the rule-making process, prescribe uniform standards for the conduct of formal rule-making and adjudicatory proceedings, and the APA restates the law of judicial review. The APA further grants U.S. Federal Courts oversight authority of Federal agencies.

    a. Section 558 (Imposition of Sanctions; Determination of Applications for Licenses; Suspension, Revocation, and Expiration of Licenses), addresses the exercise of power or authority by government agencies; it states, "a sanction may not be imposed or substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law."

    b. Chapter 7 (Judicial Review). A person is entitled to a judicial review (i.e. a reconsideration by a Federal court) when an agency's actions have caused him/her to incur a legal wrong. The reviewing court decides relevant questions of law, interprets constitutional and statutory provisions, and determines the meaning or applicability of the terms of an agency's action. Actions by the reviewing court can include setting aside an agency's actions, findings, and conclusions when the court finds the agency abused its discretion, acted in a manner that was arbitrary and capricious, or otherwise failed to comply with the law.

9. On 25 July 2018, the Under Secretary of Defense for Personnel and Readiness issued guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records (BCM/NRs) regarding equity, injustice, or clemency determinations. Clemency generally refers to relief specifically granted from a criminal sentence. BCM/NRs may grant clemency regardless of the type of court-martial. However, the guidance applies to more than clemency from a sentencing in a court-martial; it also applies to other corrections, including changes in a discharge, which may be warranted based on equity or relief from injustice. This guidance does not mandate relief, but rather provides standards and principles to guide Boards in application of their equitable relief authority. In determining whether to grant relief on the basis of equity, injustice, or clemency grounds, BCM/NRs shall consider the prospect for rehabilitation,

ABCMR Record of Proceedings (cont)                    AR20190010839

external evidence, sworn testimony, policy changes, relative severity of misconduct, mental and behavioral health conditions, official governmental acknowledgement that a relevant error or injustice was committed, and uniformity of punishment. Changes to the narrative reason for discharge and/or an upgraded character of service granted solely on equity, injustice, or clemency grounds normally should not result in separation pay, retroactive promotions, and payment of past medical expenses or similar benefits that might have been received if the original discharge had been for the revised reason or had the upgraded service characterization.

10. U.S. Court of Appeals case, Bark v. Immigration and Naturalization Service (INS), was decided in 1975; the petitioner had been denied an immigration status adjustment from student to permanent resident because INS claimed the petitioner's marriage was a sham (i.e. fraudulent). The court found INS based its determination solely the fact the petitioner and his wife had separated; the court stated a marriage can be considered a sham if the bride and groom did not intend to establish a life together at the time they married. The conduct of the petitioner and his wife after marriage only mattered if reflected the couple's subjective state of mind at the time of the marriage, and evidence of separation, by itself, was not enough to substantiate the marriage was not bona fide.

11. Harvard Law Review, Volume 99 (April 1986) included an article entitled, The Constitutionality of the INS Sham Marriage Investigation Policy. The article essentially argued the manner in which was INS investigating marriages between nonimmigrant aliens and U.S. citizens/permanent residents was intrusive; the article contended either courts or the U.S. Congress should implement procedural safeguards to ensure privacy rights were balanced with legal requirements. In its description of sham marriages, the article posited the sham marriage could either be contractual (both parties agree to marry solely for immigration purposes) or unilateral (where the nonimmigrant alien deceives the unsuspecting U.S. citizen/permanent resident into marrying).

//NOTHING FOLLOWS//

**Exhibit B**

**Reply from Army Discharge Review Board (ADRB) (*Redacted*)**



**DEPARTMENT OF THE ARMY**
ARMY DISCHARGE REVIEW BOARD
251 18TH STREET SOUTH, SUITE 385
ARLINGTON, VA  22202-3531

March 27, 2014

AR20130012817, Chen, Ding

Mr. Ding Chen



Dear Mr. Chen:

After careful review of your application, military records and all other available evidence, the Army Discharge Review Board determined that you were properly and equitably discharged. Accordingly, your request for a change in the character and/or reason of your discharge is denied.

You may reapply to the Army Discharge Review Board for a personal appearance hearing using a DD Form 293 or you may apply to the Army Board for Correction of Military Records for a correction of records using DD Form 149 (forms enclosed).  You may also apply online at http://actsonline.army.mil  If you choose to apply to the Army Board for Correction of Military Records you must do so within three years from the date of this letter.  If you choose to reapply to the Army Discharge Review Board it operates on a 15-year statute of limitations from the date of discharge; therefore, you must reapply within this time frame for a hearing.

If you believe that the decision in your case is unclear, not responsive to the issues raised, or does not otherwise agree with the requirements of the Department of Defense (DoD) Instruction 1332.28, you may submit a complaint in accordance with enclosure E5 of that instruction.  The complaint procedure does not permit you to challenge the decision, but is designed solely to ensure that the decisional document meets the requirements for clarity and responsiveness.  You may view a copy of DoD Instruction 1332.28 on the Army Review Boards Agency website – http://arba.army.pentagon.mil/adrb.htm

Sincerely,

Murray K. Blanding Sr.
Colonel, US Army
President

Enclosures

Printed on  Recycled Paper

## ARMY DISCHARGE REVIEW BOARD (ADRB)

### CASE REPORT AND DIRECTIVE

IN THE CASE OF:  Mr. Ding Chen

BOARD DATE:      26 March 2014

CASE NUMBER:   AR20130012817

---

## **Board Determination and Directed Action**

After carefully examining the applicant's record of service during the period of enlistment under review and considering the Discussion and Recommendation which follows, the Board determined the discharge was both proper and equitable and voted to deny relief.

Presiding Officer

I certify that herein is recorded the true and complete record of the proceedings of the Department of the Army Discharge Review Board in this case.

ADRB Case Report and Directive (cont)                                    AR20130012817

## THE APPLICANT'S REQUEST AND STATEMENT:

1. The applicant requests to upgrade the characterization of his service from general, under honorable conditions to fully honorable, and to change the narrative reason for his discharge.

2. The applicant states, in effect, the narrative reason for his discharge, "Fraudulent Entry", is improper. He was investigated for fraudulent marriage, fraudulent immigration, and fraudulent enlistment. His commanders thought that he fraudulently enlisted and discharged him for that reason. However, the result of the investigation is now in his favor. Accordingly, he wants to make corresponding corrections and remove the entry, "Fraudulent Entry," as the narrative reason, as described in his statement and other evidence with detailed information. The "Reduction in Force" as the narrative reason for his discharge is most suitable for him. He did not have a single Article 15 during his service in the Army but has two certificates of appreciation from the Army.

## DISCHARGE UNDER REVIEW INFORMATION:

|   |   |   |
|---|---|---|
| a. | Application Receipt Date: | 9 July 2013 |
| b. | Discharge Received: | General, Under Honorable Conditions |
| c. | Date of Discharge: | 29 June 2012 |
| d. | Reason/Authority/SPD/RE Code: | Fraudulent Entry, AR 635-200, Chapter 7, Section V JDA, RE-3 |
| e. | Unit of assignment: | Group Support Company, 1st Special Forces Group (Airborne), Joint Base Lewis-McChord, WA |
| f. | Current Enlistment Date/Term: | 16 September 2009, 4 years, 25 weeks |
| g. | Current Enlistment Service: | 2 years, 9 months, 14 days |
| h. | Total Service: | 2 years, 9 months, 14 days |
| i. | Time Lost: | None |
| j. | Previous Discharges: | None |
| k. | Highest Grade Achieved: | E-4 |
| l. | Military Occupational Specialty: | 91J10, Quartermaster and Chemical Equipment Repairer |
| m. | GT Score: | 118 |
| n. | Education: | Bachelor's Degree |
| o. | Overseas Service: | None |
| p. | Combat Service: | None |
| q. | Decorations/Awards: | NDSM; ASR |
| r. | Administrative Separation Board: | No |
| s. | Performance Ratings: | None |
| t. | Counseling Statements: | Yes |
| u. | Prior Board Review: | No |

## SUMMARY OF SERVICE:

The applicant enlisted in the Regular Army on 16 September 2009, for a period of 4 years and 25 weeks. He was 32 years old at the time of entry and had a bachelor's degree. He was

trained in and awarded military occupational specialty (MOS) 91J10, Quartermaster and Chemical Equipment Repairer. His record documents no acts of valor or significant achievement. He completed 2 years, 9 months, and 14 days of active duty service.

## SEPARATION FACTS AND CIRCUMSTANCES:

1. The evidence of record shows that on 9 May 2012, the unit commander notified the applicant of initiation of separation action under the provisions of Chapter 7, Paragraph 7-17, AR 635-200, by reason of incident of fraudulent enlistment, specifically:

   a. for procuring his enlistment through deliberate material misrepresentation, omission, or concealment of the following information, which if known and considered by the Army at the time of enlistment, his enlistment might have resulted in rejection: In that he did, at or around Los Angeles, California, on or about 28 July 2009, by means of knowingly making false representations that he was legally in the United States because he had a valid visa when in fact he was not lawfully in the United States because his visa was obtained by a fraudulent marriage, procuring himself to be enlisted as a specialist in the United States Army, and did thereafter, at or around Joint Base Lewis-McChord, Washington, received pay and allowances under the enlistment so procured.

   b. In that he did, at or near Joint Base Lewis-McChord, Washington, on or about 13 December 2011, with intent to deceive, made to Special Agent H an official statement, to wit: "I never paid any money to anyone for the marriage," which statement was totally false, and was then known by him to be so false.

2. Based on the fraudulent enlistment, the unit commander recommended a general, under honorable conditions discharge and advised the applicant of his rights.

3. Although the applicant's response with making his election of rights pursuant to consulting with legal counsel, being advised of the impact of the discharge action, and electing whether he was submitting a statement on his behalf is not available in the record. Subsequently, the unit commander recommended separation from the Army. The intermediate commander reviewed the proposed action and recommended approval of the separation with a general, under honorable conditions discharge.

4. In an undated memorandum, the separation authority approved the separation and directed the applicant's discharge with a characterization of service of general, under honorable conditions.

5. The applicant was separated on 29 June 2012, under Army Regulation 635-200, Chapter 7, Section V, with a general, under honorable conditions discharge, an SPD code of JDA, and an RE code of 3.

6. The applicant's record does not contain any evidence of unauthorized absences or time lost.

ADRB Case Report and Directive (cont)                              AR20130012817

## EVIDENCE OBTAINED FROM THE APPLICANT'S RECORD:

1. Memorandum for Record, dated 14 June 2012, subject: [The applicant] Incident of Fraudulent Entry Determinations and Findings, signed by the separation authority, provides the findings based on investigations conducted by the Department of Homeland Security Immigration and Customs Enforcement (cites case number) and the U.S. Army Criminal Investigation Division (Report of Investigation (cites case number)).

2. Memorandum for Record, undated, subject: [The applicant] Incident of Fraudulent Entry; Executive Summary of Evidence, signed by a battalion judge advocate, provides a summary of the events surrounding the applicant's enlistment with a timeline chart of sequence of events from 2002 through 2011.

3. One negative counseling statement, dated 5 April 2012, which indicates the applicant was counseled for the command receiving information that he fraudulently enlisted.

4. CID report, dated 18 April 2012, indicates the applicant was the subject of an investigation for fraudulent enlistment and making false official statement. The report contains the following, in pertinent part:

   a. Applicant's PAI/PEI Report (Security Clearance Application), dated 28 July 2009, which is self-explanatory.

   b. Standard Form 312, Classified Information Nondisclosure Agreement, dated 21 April 2010, an agreement between the applicant and the United States.

   c. USCIS Form N-400, Application for Naturalization, dated 28 January 2010, shows information entered from Part 5, Information for Criminal Record Search (page 3) through Part 14, Oath of Allegiance (page 10).

   d. Two separate Department of Homeland Security Forms G-325A, Biographic Information, dated 25 January 2008, and 23 January 2008, reflects information on the applicant and Ms. T.M.L., respectively.

   e. Department of Homeland Security Form I-130, Petition for Alien Relative, dated 23 January 2008, signed by Ms. T.M.L.

   f. County Superior Court, Decree of Dissolution (DCD) (Marriage), dated 10 December 2010, which references the marriage of the applicant, as petitioner (who signed the petition on 2 September 2010), and Ms. T.J.L, as respondent (who signed on 15 August 2010).

   g. Department of Homeland Security Report of Investigation, dated 30 June 2008, indicates the applicant was the subject of investigation for marriage fraud.

5. Memorandum, dated 10 June 2009, subject: Assignment of Select Foreign Born Soldiers to Units of the U.S. Army Special Operations Command (USASOC) is self-explanatory.

6. E-Mail Correspondence, dated 24 May 2012 through 8 June 2012, subject: FW: Follow Up/[the applicant], that were exchanged between CID special agent, an immigration officer with DHS, and a battalion judge advocate.

## EVIDENCE SUBMITTED BY THE APPLICANT:

The applicant provided a self-authored statement, dated 5 July 2013, and the following documents, each preceded with labeled evidence numbers and description: (Evidence 2) certificate of naturalization; (Evidence 3) described as applicable immigration law citing two 8 U.S.C. §§ 1325(c), 1154(c); (Evidence 4) counseling statement, dated 5 April 2012; (Evidence 5) commander's notification of separation proceedings, undated; (Evidence 6), DD Form 214 for service under current review; (Evidence 7) two employment authorization cards, dated 16 May 2009 and 16 May 2010, and Department of Homeland Security Form G-845, Document Verification Request, dated 30 June 2009, from the USAREC, Fort Knox, KY; (Evidence 8) 4 notarized affidavits, dated 20 July 2008, 18 August 2008, 26 July 2008, and 20 July 2008; (Evidence 9) 2 certificates of appreciation; (Evidence 10) 3 separate driver's licenses, dated 27 June 2008, 23 April 2009 (the applicant's), and 27 June 2008 (Ms. T.M.C.); and 6 pictures depicting the applicant and others described in the preceding sheet labeled (Evidence 11).

## POST-SERVICE ACTIVITY:

The applicant states, in effect, his Naturalization Application was granted by USCIS, and he took an oath on 23 May 2013 and became a U.S. citizen.

## REGULATORY AUTHORITY:

1. Army Regulation 635-200 sets forth the basic authority for the separation of enlisted personnel. Chapter 7, paragraph 7-17 provides, in pertinent part, that a fraudulent entry is the procurement of an enlistment, reenlistment, or period of active service through any deliberate material misrepresentation, omission, or concealment of information which, if known and considered by the Army at the time of enlistment or reenlistment, might have resulted in rejection. This includes all disqualifying information requiring a waiver. A Soldier who concealed his or her conviction by civil court of a felonious offense normally will not be considered for retention.

2. Soldiers separated under Chapter 7 may be awarded an honorable discharge, general, under honorable conditions discharge, or a discharge under other than honorable conditions. If in an entry level status, the discharge will be uncharacterized.

3. Army Regulation 635-200, paragraph 3-7a, provides that an honorable discharge is a separation with honor and entitles the recipient to benefits provided by law. The honorable characterization is appropriate when the quality of the member's service generally has met the

standards of acceptable conduct and performance of duty for Army personnel, or is otherwise so meritorious that any other characterization would be clearly inappropriate. Whenever there is doubt, it is to be resolved in favor of the individual.

4. Army Regulation 635-200, paragraph 3-7b, provides that a general discharge is a separation from the Army under honorable conditions. When authorized, it is issued to a Soldier whose military record is satisfactory but not sufficiently meritorious to warrant an honorable discharge. A characterization of under honorable conditions may be issued only when the reason for the Soldier's separation specifically allows such characterization.

5. Army Regulation 635-5-1 (Separation Program Designator (SPD) Codes) provides the specific authorities (regulatory or directive), reasons for separating Soldiers from active duty, and the SPD codes to be entered on the DD Form 214. It identifies the SPD code of "JDA" as the appropriate code to assign enlisted Soldiers who are discharged under the provisions of Army Regulation 635-200, Chapter 7, Section V, fraudulent entry.

6. The SPD Code/RE Code Cross Reference Table shows that a Soldier assigned an SPD Code of "JDA" will be assigned an RE Code of 3.

## DISCUSSION AND RECOMMENDATION:

1. The applicant's request for an upgrade of the characterization of his discharge and to change the narrative reason for his discharge was carefully considered. However, after examining the applicant's record of service, his military records, and the documents and issues submitted with the application, there are insufficient mitigating factors to merit an upgrade of the applicant's discharge or a change to the narrative reason for his discharge.

2. The record confirms the applicant's discharge was appropriate because the quality of his service was not consistent with the Army's standards for acceptable personal conduct and performance of duty by military personnel. By the procurement of his enlistment through deliberate material misrepresentation, the applicant diminished the quality of his service below that meriting a fully honorable discharge.

3. The applicant provided no independent corroborating evidence demonstrating that either the command's action was erroneous or that the applicant's service mitigated the misconduct or poor duty performance.

4. The applicant contends his discharge was improper because he did not commit fraudulent entry and wants to make corresponding corrections by upgrading his discharge to honorable and change the narrative reason to reduction in force, and the fraudulent entry is not valid and it should be removed. He asserts he was investigated for fraudulent marriage, immigration, and enlistment, and the commanders determined he fraudulently enlisted, but now the results of the investigation is in his favor since he was not charged for fraudulent marriage and/or fraudulent immigration, and he was granted his naturalization application by taking an oath on 23 May 2013, and becoming a U.S. citizen. He further contends that since he did not commit fraudulent marriage and/or fraudulent immigration, then subsequently he did not commit

"Fraudulent Entry" into the Army. However, his denial of fraudulent enlistment or entry is contradictory to the evidence contained in his official record, evidence that were obtained prior to and during his discharge proceedings. Moreover, there is a presumption of regularity in the conduct of governmental affairs that shall be applied in any review unless there is substantial credible evidence to rebut the presumption. The applicant bears the burden of overcoming this presumption through the presentation of substantial and credible evidence to support his issues. There is no evidence in the record, nor has the applicant produced any evidence, to support his contentions. The applicant's statements alone do not overcome the government's presumption of regularity and he has not provided sufficient documentation or further evidence to support his allegations.

5. The applicant contends the narrative reason for the discharge should be changed because it is invalid and should be removed. However, the applicant was separated under the provisions of Chapter 7, Section V, AR 635-200 with a general, under honorable conditions discharge. The narrative reason specified by Army Regulations for a discharge under this paragraph is "Fraudulent Entry," and the separation code is "JDA." Army Regulation 635-5, Separation Documents, governs preparation of the DD Form 214 and dictates that entry of the narrative reason for separation, entered in block 28 and separation code, entered in block 26 of the form, will be exactly as listed in tables 2-2 or 2-3 of AR 635-5-1, Separation Program Designator (SPD) Codes. The regulation further stipulates that no deviation is authorized. There is no provision for any other reason to be entered under this regulation.

6. The applicant contends that he had good service which included receiving certificates of appreciation for his contribution to the 1st Special Forces Group. The applicant's service accomplishments and the quality of his service prior to the revelation of the incidents that caused the initiation of his discharge proceeding were carefully considered. However, this service was determined not to be sufficiently mitigating to warrant an upgrade to the characterization of his discharge.

7. The applicant contends that since leaving the Army he was granted his naturalization application, took an oath, and became a U.S. citizen. However, in review of the applicant's entire service record and the reasons for the discharge, it appears that his subsequent accomplishments did not overcome the reason for discharge and characterization of service granted.

8. Finally, regarding the four notarized affidavits provided with the application, they are dated in July and August 2008, prior to the applicant's enlistment date, but were certified as true copies in May 2012. Although they relate having personal knowledge of the applicant's relationship, they appear to have been provided for an investigation prior to the applicant's enlistment. As such, none of these statements provide any evidence sufficiently compelling to overcome the presumption of government regularity at this time.

9. The record does not contain any indication or evidence of arbitrary or capricious actions by the command and all requirements of law and regulation were met and the rights of the applicant were fully protected throughout the separation process. The character of the applicant's discharge is commensurate with his overall service record. Accordingly, the

ADRB Case Report and Directive (cont)                    AR20130012817

records show the proper discharge and separation authority procedures were followed in this case.

10. Therefore, the reason for discharge and the characterization of service being both proper and equitable, recommend the Board deny relief.

## SUMMARY OF ARMY DISCHARGE REVIEW BOARD HEARING:

Type of Hearing:  Records Review       Date:  26 March 2014       Location: Washington, DC

Did the Applicant Testify?  No

Counsel:  None

### Board Vote:
Character Change:  0       No Change:  5
Reason Change:     0       No Change:  5
(Board member names available upon request)

### Board Action Directed:
Issue a new DD Form 214:              No
Change Characterization to:           No Change
Change Reason to:                     No Change
Change Authority for Separation:      No Change
Change RE Code to:                    No Change
Grade Restoration to:                 NA
Other:                                NA

Legend:
AMHRR - Army Military Human Resource Record
AWOL - Absent Without Leave
BCD - Bad Conduct Discharge
CG - Company Grade Article 15
CID - Criminal Investigation Department

FG - Field Grade
GD - General Discharge
HS - High School
HD - Honorable Discharge
MP  - Military Police

IADT – Initial Active Duty Training
NA - Not applicable
NIF - Not in File
OAD - Ordered to Active Duty
OMPF - Official Military Personnel File

RE - Reentry
SCM- Summary Court Martial
SPCM - Special Court Martial
UNC - Uncharacterized Discharge
UOTHC - Under Other Than
        Honorable Conditions

1
2
3
4
5
6
7
8

**Exhibit C**

9

10

11 **E-mail Correspondence (subject: FW: Follow Up/Ding Chen) (*Redacted*)**

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Koschnitzky Christopher J CPT (1SFG)

| | |
|---|---|
| From: | San Miguel, Kari S [Kari.S.SanMiguel@uscis.dhs.gov] |
| Sent: | Friday, June 08, 2012 12:39 PM |
| To: | Koschnitzky, Christopher J CPT USARMY (US) |
| Subject: | FW: Follow Up/Ding Chen (UNCLASSIFIED) |
| Signed By: | KSSanmig@fins3.dhs.gov |

| | |
|---|---|
| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |

-----Original Message-----
From: San Miguel, Kari S
Sent: Friday, June 08, 2012 10:17 AM
To: 'Koschnitzky Christopher J CPT (1SFG)'
Subject: FW: Follow Up/Ding Chen (UNCLASSIFIED)


-----Original Message-----
From: San Miguel, Kari S
Sent: Tuesday, June 05, 2012 4:20 PM
To: 'Koschnitzky Christopher J CPT (1SFG)'
Cc: Wylie, Scott W
Subject: RE: Follow Up/Ding Chen (UNCLASSIFIED)

Hi, Chris, Thanks so much. I have the same problem with emails to NCIS.

OK, so yes, the Employment authorization ("EAD") was issued to CHEN by USCIS
as part of his marriage based residency application. His application was
pending as of 02/11/2008. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓ The card issued in 2009 was the 2nd such employment document
issued to him while his residency application was pending.



As his residency application remained in pending status, the "employment
authorization" card application (form I-765) was independently approvable.





The G845 verified that the employment card was genuine,

I hope this helps. If I used too much jargon, please let me know.

Kari


-----Original Message-----
From: Koschnitzky Christopher J CPT (1SFG)
[mailto:chris.koschnitzky@soc.mil]
Sent: Tuesday, June 05, 2012 11:07 AM
To: San Miguel, Kari S
Subject: RE: Follow Up/Ding Chen (UNCLASSIFIED)

Kari,

Please see attached.  I apologize for the late reply.  How a .gov email to a
.mil account gets marked as spam is beyond me.

Chris

-----Original Message-----
From: San Miguel, Kari S [mailto:Kari.S.SanMiguel@uscis.dhs.gov]
Sent: Wednesday, May 30, 2012 8:59 AM
To: Koschnitzky Christopher J CPT (1SFG)
Subject: [POSSIBLE SPAM] RE: Follow Up/Ding Chen (UNCLASSIFIED)
Importance: Low

Can you please send me a copy of the card (valid 5/17/09 to 05/16/10)?

Thank you,
Kari

-----Original Message-----
From: Koschnitzky Christopher J CPT (1SFG)
[mailto:chris.koschnitzky@soc.mil]
Sent: Tuesday, May 29, 2012 2:45 PM
To: San Miguel, Kari S
Subject: RE: Follow Up/Ding Chen (UNCLASSIFIED)

Kari,

SPC Chen submitted copies of his employment authorization cards.  I was
tracking that he was lawfully in the U.S. until 01/31/08 as part of approved
Optional Practical Training from a work visa.  Thereafter, his lawful status
was only because of the marriage

The relevant card is valid from 5/17/09 to 5/16/10.  He enlisted on

07/28/09.

SPC Chen submitted this document to his recruiter, and the doc was verified
by USCIS on Form G-845. The verification notes that the doc appeared valid
and that the alien had an application pending for a "pending adjustment of
status." It is dated as received on 07/08/09.

Is there a way to check what status allowed for him to have this card? My
assumption is that this card was issued because of the pending adjustment of
status from a work-type authorization to a marriage-type authorization. I
apologize if my terminology is off.

I suspect the Commanders will want an answer from me on these issues before
making a decision.

Thank you -

V/r
Chris Koschnitzky
CPT, JA
Battalion Judge Advocate
1st Special Forces Group (Airborne)
3d BN: (253) 966-2874 (DSN 357)
GSB:  (253) 477-3481 (DSN 677)
Cell:  (219) 688-8268
NIPR: chris.koschnitzky@ahqb.soc.mil
SIPR: chris.koschnitzky@usasoc.socom.smil.mil


-----Original Message-----
From: Koschnitzky Christopher J CPT (1SFG)
Sent: Tuesday, May 29, 2012 9:25 AM
To: San Miguel, Kari S
Cc: Hessler, Michael P SA MIL USA
Subject: RE: Follow Up/Ding Chen (UNCLASSIFIED)

Good morning Kari,

Yes, we have initiated separation against the Soldier. He has until 30 May
12 to submit matters for the Group Commanded to consider before making a
separation decision.

My best guess is that he should be separated on/about 15-22 June 12 for
fraudulent enlistment, barring some significant currently unknown
information brought to our attention by the Soldier in his matters.

V/r
Chris


Chris Koschnitzky
CPT, JA
Battalion Judge Advocate
1st Special Forces Group (Airborne)
3d BN: (253) 967-2874 (DSN 357)
GSB:  (253) 477-3481 (DSN 677)
Cell:  (219) 688-8268

NIPR: chris.koschnitzky@ahqb.soc.mil
SIPR: chris.koschnitzky@usasoc.socom.smil.mil


-----Original Message-----
From: Hessler, Michael P SA MIL USA [mailto:michael.p.hessler@us.army.mil]
Sent: Thursday, May 24, 2012 4:38 PM
To: San Miguel, Kari S
Cc: Koschnitzky Christopher J CPT (1SFG)
Subject: RE: Follow Up/Ding Chen (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Ma'am,

Doing as well can be with a veracious 2 year old.  I can't comment for CPT
KOSCHNITZKY.  However, I did cc him.

Best Regards,

MPH


-----Original Message-----
From: San Miguel, Kari S [mailto:Kari.S.SanMiguel@uscis.dhs.gov]
Sent: Thursday, May 24, 2012 3:51 PM
To: Hessler, Michael P SA MIL USA
Subject: Follow Up/Ding Chen

Hello Agent Hessler,


Hope you are doing well.


Has the prosecutor been able to take action towards discharge?


Also, I am looking at another army member in an unrelated case. ███████████
████████████████████████████████████████████████████


Thanks,

Kari


Kari San Miguel | FDNS Immigration Officer | DHS | USCIS | Fraud Detection
and National Security Directorate | Seattle Field Office| 12500 Tukwila
International Blvd, Seattle, WA 98168| *: 206-241-3034 | 7: 206-241-3036 |

\*: kari.s.sanmiguel@uscis.dhs.gov

WARNING: This document is and any attachments are FOR OFFICIAL USE ONLY
(FOUO). It contains information that may be exempt from public release under
the Freedom of Information Act (5 U.S.C. 552). This document is to be
controlled, handled, transmitted, distributed, and disposed of in accordance
with DHS policy relating to Sensitive But Unclassified (SBU) information and
is not to be released to the public or other personnel who do not have a
valid "need-to-know" without prior approval from the originator.


Classification: UNCLASSIFIED
Caveats: NONE

1
2
3
4
5
6
7
8               **Exhibit D**
9
10
11      **Separation Authority's Determinations and Findings**
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**DEPARTMENT OF THE ARMY**
1ST SPECIAL FORCES GROUP (AIRBORNE)
MAILSTOP 78, BOX 339500
JOINT BASE LEWIS-MCCHORD WA 98433-9500

2012

REPLY TO
ATTENTION OF

AOSO-SFI-CO

MEMORANDUM FOR RECORD

SUBJECT: SPC Ding Chen Incident of Fraudulent Entry Determinations and Findings

1. In accordance with AR 635-200, ch. 7, I make the following findings based on investigations conducted by the Department of Homeland Security Immigration and Customs Enforcement (Case Number SF17ER06SF0033) and U.S. Army Criminal Investigation Division (Report of Investigation 0998-2011-CID016-46264-8D1/5M3C):

   a. That SPC Ding Chen concealed information that his conditional permanent residence in the United States at the time of enlistment was not valid because his temporary marriage visa was procured by a fraudulent marriage. In order to effect the fraudulent marriage, SPC Chen violated 18 USC § 371 (conspiracy to commit offense or to defraud the United States), 8 USC § 1325(c) (immigration marriage fraud); and 18 USC § 1546(a) (using false statement to obtain green card).

   b. That SPC Chen did not meet citizen requirements when he enlisted, and that this requirement is of a disqualifying nature for enlistment. In making this determination, I considered AR 601-2810, para. 2-4 and 4-22, and 10 § USC 504, and Memorandum, Deputy Chief of Staff, 28 Jan 09, subject: Military Accessions Vital to the National Interest (MAVNI) Pilot Program Implementation Policy.

   c. That SPC Chen enlisted through the MAVNI program on 28 Jul 09. The Army believed he was authorized to participate in the program because he falsely represented that he was legally in the United Sates by possessing a temporary visa procured by a bona fide marriage to a United States citizen. The MAVNI program is open only to individuals who have had a valid immigration status for the previous two years prior to their enlistment. SPC Chen's immigration status was not valid.

2. I have verified the existence and truthfulness of the disqualifying information as indicated in the attached investigative reports.

3. Action will be taken to suspend SPC Chen's pay and allowances IAW DOD 7000.14-R.

4. Point of contact for this memorandum is the Group Judge Advocate, MAJ Chris Ford, at 253-967-8661 (DSN 357) or Christopher.ford@ahqb.soc.mil.

FRANCIS BEAUDETTE
COL, SF
Commanding

1

2

3

4

5

6

7

8                              **Exhibit E**

9

10

11                      **News from Army Times**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



16 August 1999                                              www.armytimes.com

# Lawsuits settled in ousted soldiers' favor

**By Jim Tice**
TIMES STAFF WRITER

Faced with a pair of tough court battles, the Army has upgraded the stigmatizing discharges of two soldiers it forced out in the early 1990s without giving them a chance to plead their cases.

The soldiers, one an active-duty reserve captain and the other an Army sergeant first class, both had lawsuits before the Court of Federal Claims in Washington, D.C., when they dropped their cases against the Army. Under the deal, their discharges will be changed from "general" to "honorable."

The soldiers claimed they were separated without regard to their "due process" rights under the Constitution.

Justice Department attorneys representing the Army settled the cases just days after the court finalized the recall to active duty and award of $123,000 in back pay to Maj. Victor Gonzalez, an Active Guard and Reserve officer who had a similar case.

Gonzalez was released from service in 1995 after a Department of the Army Active Duty Board recommended discharge based on a letter of reprimand that charged the 16-year veteran with misconduct for failing an Army drug test. The drug charge was the subject of an Article 32 probe under the Code of Military Justice, but Gonzalez never was given an opportunity to plead his case.

Instead, the Army sought his discharge through administrative channels. But the Court of Federal Claims found that because the Army separated Gonzalez with a stigmatizing "general discharge" for alleged misconduct, he was entitled to a hearing, where he could have disputed the charges.

"The due process clause of the federal Constitution obligates the Army to provide [Gonzalez] with a hearing prior to his discharge," Judge Lawrence Margolis ruled.

One the two due process suits dropped recently involved a reserve captain who, while serving on active duty in 1991, was charged with misconduct relating to finances and submitting false claims. The officer received a general discharge.

In the second case, Sgt. 1st Class Allan Viernes was involuntarily separated in 1992 after an administrative review board determined that civil proceedings brought against the Army recruiter for alleged spousal abuse warranted his separation from service.

He was given a general discharge coded "RE-4," meaning he "definitely (is) not eligible for re-enlistment."

In the settlements (Cases 97-850C and 98-308C), the Army agreed to upgrade the discharges and make appropriate changes in their files.

John W. Wickham, who specializes in military issues and represented Gonzalez, said the three cases point to inequities in the Army's administrative discharge procedures regarding reserve officers who do not have the same appeal rights as regulars. The Viernes case also demonstrates that Regular Army enlisted soldiers are vulnerable to the same type of treatment as reservists, he said.

Sources on both the Army Staff and Secretariat said legal officials were surprised by the Gonzalez decision, and do not want it to become a strong precedent in federal courts.

"That's also why the Army settled these two other cases," said one senior officer. "They did not want adverse rulings. The whole system [of administrative discharge] could fold if that happened."

1
2
3
4
5
6
7
8                              **Exhibit F**
9
10
11          **Plaintiff's Certificate of Naturalization (*Redacted*)**
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

No. 35702789



THE UNITED STATES OF AMERICA

CERTIFICATE OF NATURALIZATION

DEPARTMENT OF HOMELAND SECURITY

*Personal description of holder as of date of naturalization.*

*Sex:* **MALE**

*Height:* **5** *feet* **8** *inches*

*Marital status:* **DIVORCED**

*Country of former nationality:* **CHINA, PEOPLE'S REPUBLIC OF**

*I certify that the description given is true, and that the photograph affixed hereto is a likeness of me.*

*Ding Chen*

(Complete and true signature of holder)

*USCIS Registration No.* **A087297678**

*Be it known that, pursuant to an application filed with the Secretary of Homeland Security*

*at:* **LOS ANGELES, CALIFORNIA**

*The Secretary having found that:*

**DING CHEN**

*residing at:* **SAN GABRIEL, CALIFORNIA**

*having complied in all respects with all of the applicable provisions of the naturalization laws of the United States, being entitled to be admitted as a citizen of the United States, and having taken the oath of allegiance at a ceremony conducted by*

**US DISTRICT COURT CENTRAL DISTRICT**

*at:* **LOS ANGELES, CALIFORNIA**    *on:* **MAY 23, 2013**

*such person is admitted as a citizen of the United States of America.*

Alejandro N. Mayorkas **, Director**

*U. S. Citizenship and Immigration Services*

1
2
3
4
5
6
7
8                                   **Exhibit G**
9
10
11              **Certificates of Appreciation from the Army**
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Special Forces Sniper Committee, Operations Detachment

GROUP SUPPORT BATTALION

1st SPECIAL FORCES GROUP (AIRBORNE)

JBLM, WA. 98433

# Certificate of Appreciation

Is presented to

*SPC Ding Chen*

For your contributions and support during the 1st Special Forces Group (Airborne) / Hong Kong SDU Subject Matter Expert Exchange. Your contributions were greatly appreciated and contributed to the high level of training, the success of the mission, and to the Global War on Terrorism.

HIPOLITO GONZALEZ
CSM, USA
Command Sergeant Major

ANTHONY L. HAYCOCK
LTC, LG
Commanding



Special Forces Sniper Committee, Operations Detachment

1st GROUP SUPPORT BATTALION

1st SPECIAL FORCES GROUP (AIRBORNE)

JBLM, WA. 98433

# Certificate of Appreciation

Is presented to

## SPC Ding Chen

For your contributions and support during the 1st Special Forces Group (A) Special Forces Sniper Course 10-02 from 06 September through 08 October 2010.

Your contributions were greatly appreciated and contributed to the high level of training, the success of the mission, and to the Global War on Terrorism.

MICHAEL W. SCHAEPER
MSG, USA
SFSC NCOIC